**Robert S. GOMBOSI, Sr. and Carole G. Gombosi, Plaintiffs,**

v.

**CARTERET MORTGAGE CORPORA-TION and Resolution Trust Corporation, in its capacity as Receiver of Carteret Savings Bank, F.A., Defendants.**

Civ. A. No. 92–CV–3646.

United States District Court,
E.D. Pennsylvania.

July 20, 1995.

**OPINION AND ORDER**

VAN ANTWERPEN, District Judge.

In the only remaining Count of their Complaint,[1] plaintiffs Robert and Carole Gombosi allege that defendants violated the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, as amended ("TILA") and its accompanying regulations, 12 C.F.R. §§ 226.1 *et seq.*, by failing to make required disclosures and failing to provide plaintiffs a right of rescission in connection with a $250,000 loan secured by a mortgage on plaintiffs' principal residence. Defendants Carteret Mortgage Corporation and the Resolution Trust Company, in its capacity as Receiver of Carteret Savings Bank, F.A., have moved for summary judgment on the ground that the transaction at issue is not covered by TILA.[2]

TILA's disclosure requirements do not apply to "credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes...." 15 U.S.C. § 1603(1); 12 C.F.R. § 226.3(a). Rather, TILA's scope is limited to "consumer" credit transactions, which are defined as transactions in which "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h); 12 C.F.R. § 226.2(p). Defendants argue that because the transaction at issue here was primarily business or commercial in nature, TILA does not apply and therefore plaintiffs' claims must fail. Plaintiffs contend that the transaction is properly characterized as personal, pointing out that the defendants attempted to comply with TILA's requirements. In the alternative, they argue that this issue should be left for the trier of fact to decide. This court has jurisdiction under 15 U.S.C. § 1640(e) and 28 U.S.C. § 1337.

## I. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the

Donald P. Russo, Allentown, PA, for plaintiffs.

Tsiwen M. Law, Philadelphia, PA, for defendants.

---

1. With the agreement of both parties, by its Order of May 5, 1995, this Court entered judgment in favor of defendants on Count II of the Complaint, which alleged a violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*

2. Defendants have also moved for summary judgment and partial summary judgment on several other grounds.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In Re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## II.  FACTUAL BACKGROUND

The undisputed facts relevant to the question of whether this transaction was primarily for business or personal purposes are as follows. Sometime prior to September 24, 1990, plaintiffs applied for a mortgage through the Suburban Mortgage Group, Inc., ("Suburban Mortgage") a mortgage broker located in Bluebell, Pennsylvania. Plaintiffs already owned their residence at 937 Barnsdale Road in Bethlehem, Pennsylvania, although it was subject to an existing mortgage. Plaintiffs were refinancing their existing mortgage as well as borrowing additional money.

In her deposition, Mrs. Gombosi stated that the purpose of the new mortgage loan was "[to] refinance." Deposition of Carole Gombosi, at 6. Similarly, Mr. Gombosi testi-

fied that the loan was intended to pay off existing debts. Deposition of Robert Gombosi, at 5.[3] In an August 24, 1990 form document addressed to Suburban Mortgage, the Gombosis described the purpose of the loan as "debt consolidation."[4]

In a letter dated September 24, 1990, Suburban Mortgage informed plaintiffs that their loan application had been approved at a fixed annual interest rate of 10.75% with a thirty-year term for a principal amount of $250,000. As stated in the letter, the loan had to be secured by a first mortgage on plaintiffs' residence. Accordingly, satisfaction of plaintiffs' existing residential mortgage, which was held by Keystone Savings Association, was a condition of the loan commitment. Satisfaction of another outstanding loan from Meridian Bank was also a condition of the commitment.

The Complaint alleges that Suburban Mortgage obtained a mortgage for plaintiffs from defendant Carteret Mortgage Corporation ("the Carteret loan"). Carteret Mortgage Corporation's letterhead describes it as "a division of Carteret Savings Bank, F.A.," and several documents in the record identify former defendant Carteret Savings Bank, F.A. as the lender. After the inception of this litigation, Carteret Savings Bank, F.A. was put into receivership, and the receiver, Resolution Trust Corporation, was substituted for Carteret Savings Bank, F.A. as a defendant.

Closing for the Carteret loan occurred on October 22, 1990. The U.S. Department of Housing and Urban Development Disclosure and Settlement Statement ("HUD settlement sheet") signed by the Gombosis on that date details the disposition of the $250,000.00 principal which was disbursed.

According to the HUD settlement sheet, $14,817.35 of the principal amount was disbursed for various fees and other closing

---

3. Specifically, Mr. Gombosi stated: "I know when we had gone in for the mortgage, we had intended to pay some of the things off; and it was supposed to take care of the mortgage and some other things, along with some money that was in there for my daughter's education...."

4. Although it was attached as an exhibit to defendants' Supplemental Memorandum of Law, this document does not appear to have been authenticated via deposition testimony or any other appropriate method. However, in a telephone conference with the Court on July 19, 1995, counsel for both parties stipulated on the record to its authenticity.

costs, including, for example, a loan origination fee, a loan discount fee, prepaid interest, several reserves which were deposited with the lender, title insurance, and recording fees. In addition, a total of $10,261.30 was disbursed to satisfy various outstanding city, school, and county taxes.

In accordance with the conditions set out by Suburban Mortgage in their loan commitment letter, $65,015.50 of the proceeds of the Carteret loan went to pay off a loan from Meridian Bank. Mr. and Mrs. Gombosi both testified that they had obtained several business loans from Meridian Bank. At least one of these Meridian Bank loans was for Car Village, an automobile sales business owned by Mr. Gombosi. Another was a joint loan signed by the Gombosis, their son, and his wife, which was taken out in October 1986 in the amount of $60,000.00. The Promissory Note for this loan described its purpose as "equity injection into real estate partnership." Mr. Gombosi's testimony confirmed that the proceeds of this 1986 loan were used for an initial investment in a real estate development venture known as the Eagle Trace Housing Development "that [the Gombosis] were constructing along with partners that [Mr. Gombosi] had." R. Gombosi Dep., at 6, 10.

Final payment on the Eagle Trace Housing Development loan was to have come due on October 30, 1990,[5] which was just eight days after the closing of the Carteret loan. Nevertheless, the Gombosis testified that they could not remember for certain whether it was the Eagle Trace Housing Development loan which was repaid to Meridian Bank with the $65,015.50 disbursed from the Carteret loan.[6] In fact, Mr. Gombosi testified that he did *not* think this sum was for the Eagle Trace Housing Development loan. Rather, both he and Mrs. Gombosi thought that it had been used to pay back funds borrowed in connection with the Car Village sales business. In any event, Mr. Gombosi clearly testified at least twice that the $65,015.50 of Carteret funds disbursed to Meridian Bank went to repay money from *business* loans. Similarly, Mrs. Gombosi testified that the money received from the Carteret loan went into her husband's business.

In further compliance with the conditions set out in Suburban Mortgage's loan commitment letter, $114,622.80 of the loan proceeds was disbursed to satisfy the existing Keystone Savings Association mortgage on the Gombosis' home at 937 Barnsdale Road. The Keystone Savings Association mortgage had been taken out in April 1986. Its original amount was $116,500, with a thirty-year term at a fixed annual interest rate of 9.75%.

According to the HUD settlement sheet, the Gombosis received the remaining net funds of $45,283.05 of the Carteret loan in cash at the time of settlement. Mr. Gombosi testified that he could not remember whether he in fact received these net funds in cash or whether they went to Meridian Bank. He did manage to remember that part of this money was used to pay off a loan the Gombosis had taken from the Car Village business to finance their daughter's college education. Mr. Gombosi could not remember, however, how much money he had borrowed from Car Village for this purpose, only that "it was several thousand dollars one time, several thousand dollars the next time" and that the total amount was less than $4,000 to $5000. R. Gombosi Dep., at 9.[7] Mr. Gombosi testi-

---

**5.** The final payment date for the Eagle Trace Housing Development loan can be determined from several documents in the record. As part of the processing of the Gombosis' mortgage application, a loan processor at Suburban Mortgage made an inquiry to Meridian Bank regarding the Gombosis' outstanding loans there. According to a contemporaneous memo written by the loan processor, a staff secretary at Meridian Bank stated that final payment for Gombosi loan # 0196667 was due on October 30, 1990. The Promissory Note identified by Mr. Gombosi as corresponding to the Eagle Trace Housing Development loan has the number 0196667/9001 handwritten at the top of it.

**6.** Indeed, Suburban Mortgage's loan commitment letter lists satisfaction of Meridian Bank # 05060549 as a requirement of the commitment, while the number for the Eagle Trace Housing Development loan appears to have been 0196667/9001, *see supra* note 5.

**7.** Page 9 of the copy of Mr. Gombosi's deposition that was filed with the court reads in part as follows:

Q: How much money did you give her from Car Village?

Q: Did it total up to 45,000?

fied that the remainder of the approximately $45,000 net funds went into the Car Village business to purchase inventory, or to pay off business loans. He added that "we never got any big money in our hand that we went out and spent." R. Gombosi Dep., at 10.

In the course of obtaining the Carteret loan, the Gombosis did receive some Truth in Lending disclosure documents. Sometime prior to closing, they received from Suburban Mortgage two documents entitled "Notice of Right to Cancel" and "Truth in Lending Disclosure." They also received from Carteret Savings Bank, F.A. two different Truth in Lending disclosure statements. The first was apparently given to the Gombosis at the closing. The second was sent to them by Carteret several months later and purported to correct an error in the previous disclosure statement.

## III. DISCUSSION

▇▇▇ In determining whether a transaction is primarily consumer or commercial in nature for purposes of TILA exemption, the court must examine the transaction as a whole and the purpose for which the credit was extended. *Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir.1980); *Bokros v. Associates Finance, Inc.*, 607 F.Supp. 869, 871 (N.D.Ill.1984). "[T]he entire surrounding factual circumstances" should be considered. *Tower v. Moss*, 625 F.2d at 1166 n. 4. Where an examination of the transaction as a whole and the purpose for which credit was extended shows that the loan was primarily a business loan, TILA does not apply. *See, e.g., Quinn v. A.I. Credit Corp.*, 615 F.Supp. 151, 154 (E.D.Pa.1985) (transaction financing commercial fire insurance policy was exempt from TILA); *In re DiPietro*, 135 B.R. 773 (Bankr.E.D.Pa.1992) (TILA was inapplicable

to loan used to finance establishment of tailor shop).

▇▇▇ Where credit is extended for both personal and business reasons, the mere fact that the transaction has *some* personal purpose does not automatically render it subject to the provisions of TILA. *See Quinn v. A.I. Credit Corp.*, 615 F.Supp. at 154. Rather, the court must determine whether the transaction is *primarily* for personal, family or household purposes. *Id.* The plaintiff bears the burden of showing that a disputed transaction is "a consumer credit transaction, not a business transaction." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 751 (3d Cir.), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *Quinn v. A.I. Credit Corp.*, 615 F.Supp. at 153.

Considering all of the surrounding factual circumstances, we find that plaintiffs have not identified disputed issues of fact which preclude summary judgment and that on the undisputed facts before us plaintiffs have not met their burden of producing evidence from which a reasonable jury could conclude that the purpose of the Carteret loan was primarily personal. Instead, the undisputed facts indicate that the primary purpose of the Carteret loan was a business purpose, namely, to refinance existing business debts.

In their deposition testimony, both of the Gombosis indicated that the purpose of the Carteret loan was refinancing or "paying off" existing debts. Similarly, their signed statement addressed to Suburban Mortgage described the purpose of the loan as "debt consolidation." Standing alone, these statements are neutral and do not indicate either a business or personal purpose. Accordingly, in order to determine the primary purpose of the transaction, we must examine the nature of the debts that were refinanced.

A: No, it didn't, no.
Q: Was it maybe less than 45,000?
A: Somewhere around there.
However, also filed with the deposition transcript in a pocket at the back was another copy of page 9, in which the same exchange is transcribed as follows:
Q: How much money did you give her from Car Village?

Q: Did it total up to 4 to 5,000?

A: No, it didn't, no.
Q: Was it maybe less than 4 to 5,000?
A: Somewhere around there.
In a telephone conference on July 19, 1995, counsel for both parties stipulated on the record that the latter, amended version of page 9 was the correct one.

We have noted that some $14,817.35 of the $250,000 Carteret loan went toward various fees and closing costs. Since these costs would have been incurred whatever the purpose of the loan, we find that they do not carry any weight in the determination of the primary purpose of this transaction.

We have also noted that a large portion of the loan proceeds, some $114,622.80 was disbursed to satisfy plaintiffs' existing residential mortgage with Keystone Savings Association. In addition, $10,261.30 was disbursed for the payment of various outstanding taxes.

Although the refinancing of a residential mortgage would in many cases be a loan for personal purposes, that is not the situation in this case. The Gombosis were not refinancing to obtain a more favorable interest rate or to obtain lower monthly payments, but were instead refinancing at an interest rate that was a full percentage point higher than that of the existing Keystone Savings Association mortgage.[8] Furthermore, the satisfaction of the Keystone Savings Association mortgage was an express loan condition so as to create a first mortgage lien position on the Gombosis' residence in favor of Carteret Savings Bank, F.A. Similarly, the payment of outstanding taxes was a necessary prerequisite to protect the first mortgage rights of Carteret.[9] All these facts indicate that the refinancing of an existing residential mortgage and the making of tax payments were not the primary purpose of the Carteret loan. Rather, the primary purpose of the Carteret loan was to acquire the remaining proceeds after the satisfaction of all the conditions of obtaining the loan. Thus, we find that the disposition of those remaining proceeds must weigh heavily in determining the primary purpose of the Carteret loan.

After the amounts that went toward fees, taxes, and satisfaction of the Keystone Savings Association mortgage are deducted, the remaining proceeds of the loan total approximately $110,000. Of this amount, some $65,015.50 went to pay off an existing loan from Meridian Bank. Although it is unclear precisely which loan from Meridian Bank was

repaid, the fact that the $60,000 Eagle Trace Housing Development loan was coming due on October 30, 1990 strongly suggests that it was this loan which was in fact repaid. Resolution of this factual issue is not necessary to our decision, however, for it is undisputed that the repaid loan was a *business* loan.

The Gombosis received the remaining net funds of $45,283.05 of the loan proceeds at the time of closing. Mr. Gombosi testified that some of this money went toward his daughter's college education, while the rest was used for business purposes, namely to purchase inventory for Car Village and to pay off other business debts. Mr. Gombosi was unable to recall exactly how much of the $45,283.05 he spent on his daughter's college education, however, he did testify that it was less than $4000 to $5000.

Although we agree with plaintiffs that payment of a child's college expenses is properly classified as a "personal" or "family" expense, in this case only a very small portion of the loan proceeds were used for this purpose. Even if we assume that a full $5000 of the funds went toward college expenses, more than $105,000 of the $110,298.55 that remained after the payment of fees, taxes, and satisfaction of the Keystone Savings Association mortgage still went toward business purposes.

Thus, even viewing the facts in the light most favorable to the plaintiffs, as we must, we conclude that the Carteret loan was taken out for a business purpose. Plaintiffs have the burden of proving that the *primary* purpose of the Carteret loan primarily was personal, and they have simply presented no facts from which a reasonable jury could reach this conclusion. Indeed, the only evidence of personal use they have identified for the loan is that a small portion of its proceeds went toward payment of their daughter's college expenses. Defendants, on the other hand, have shown that at all of the $65,015.50 amount paid to Meridian and more than $40,000 of the $45,283.05 amount of net funds went toward business purposes. In addition, defendants have established that

---

**8.** Both loans had fixed interest rates and 30–year terms.

**9.** *See* 42 Pa.C.S.A. § 8152(a).

refinancing the existing Keystone Savings Association mortgage was obviously not a primary purpose of this loan, as the refinancing actually resulted in a higher interest rate than the Gombosis were previously paying.

Plaintiffs point out that, by attempting to make the required disclosures, defendants themselves treated the transaction as if it were subject to TILA. They contend that this fact weighs in favor of a finding that the purpose of the transaction was primarily personal. We find this argument to be unavailing. The Official Staff Interpretations of Regulation Z Truth in Lending, 12 C.F.R. Pt. 226, Supp. I, § 226.3(a)(1) specifically states that "[i]f some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt." Here, it appears likely that defendants were not aware of the primary purpose of the loan at the time they attempted to make the TILA disclosures. In fact, the only record evidence that appears to have been available at that time was plaintiffs' written statement to Suburban that the purpose of the loan was "debt consolidation." Under these circumstances, the fact that defendants attempted to make the required disclosures, standing alone, cannot possibly outweigh the considerable evidence tending to show that plaintiffs undertook the transaction primarily for business purposes.

■ As for plaintiffs' contention that the primary purpose of the transaction is an issue for the trier of fact to decide, we disagree. Where the relevant facts are not in dispute, the court may decide the TILA exemption question as a matter of law. *See Bokros v. Associates Finance, Inc.*, 607 F.Supp. at 872; *Quinn v. A.I. Credit Corp., supra* (granting summary judgment on ground that Act was inapplicable because transaction was primarily commercial). Although plaintiffs claim that outstanding issues of material fact exist, they have pointed to no such issues. The Gombosis' "mere denials" of defendants' evidence of the purpose of the loan cannot suffice to withstand a motion for summary judgment. *See First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d at 282.

## IV. CONCLUSION

■ For all of the foregoing reasons, we find that the Carteret loan was undertaken primarily for business or commercial purposes. Accordingly, TILA does not apply to this transaction and defendants are entitled to summary judgment on Count I of the Complaint.[10] An appropriate order follows.

### *ORDER*

AND NOW, this 20th day of July, 1995 after full consideration of defendants' Motion

---

**10.** Because we dispose of the case on this ground, we do not reach defendants' other grounds for summary judgment. We note however, that we find defendants' argument that this action is barred by the applicable statute of limitations to be, for the most part, without merit.

Under 15 U.S.C. § 1635(f), a borrower has three years after the date of the consummation of the transaction within which to bring an action for rescission. *See Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 902 (3d Cir.1990). Here, it appears that the earliest possible "consummation" date would be the date of the commitment letter, September 24, 1990. More likely, the appropriate date for purposes of the statute of limitations would be October 22, 1990, the date of the closing of the transaction. Either way, because this action was filed on June 23, 1992, the Gombosi's claim for rescission would be timely under the statute as within the three year period.

In order to maintain an action for actual or statutory damages under TILA, the action must be brought "within one year from the occurrence of the violation." 15 U.S.C. 1640(e); *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d at 896. The Gombosis allege several violations which derive from the disclosures made to them in and around September and October of 1990. Therefore, to the extent plaintiffs seek actual or statutory damages based on these disclosure violations, the statute of limitations has run. However, the failure to honor a request for rescission constitutes a separate violation of the Act, giving rise to a separate claim for damages. *See In re Wright*, 133 B.R. 704, 708–09 (E.D.Pa.1991). Although it is not clear exactly when and if the Gombosis actually attempted to rescind the Carteret mortgage prior to the institution of this lawsuit, and the parties have not addressed this point, it appears likely that the attempted rescission occurred within one year prior to the filing of this action on June 23, 1992. If so, a claim for damages based on a failure to honor a request for rescission would also not be barred by the applicable statute of limitations.

for Partial Summary Judgment, filed on May 9, 1995, plaintiffs' response thereto, filed on May 22, 1995, and defendants' Supplemental Memorandum of Law, filed on June 1, 1995, it is hereby ORDERED that defendants' motion is GRANTED. Judgment is entered in favor of defendants Carteret Mortgage Corporation and Resolution Trust Corporation and against plaintiffs Robert and Carole Gombosi as to Count I of plaintiffs' Complaint.

Defendants' Motion for Partial Summary Judgment on damages, filed on April 28, 1995, is hereby DISMISSED as MOOT.

This case is CLOSED.