679 A.2d 800

POTOMAC COAL COMPANY, a Corporation, PNC Bank, National Association, formerly Pittsburgh National Bank, a National Banking Association, and Clise Coal Company,

v.

$81,961.13, IN the HANDS OF AN ESCROW AGENT.

Appeal of PNC BANK, NATIONAL ASSOCIATION.

Superior Court of Pennsylvania.

Argued Feb. 8, 1996.

Filed June 26, 1996.

Richard B. Tucker, III, Pittsburgh, for appellant.

Robert W. Koehler, Pittsburgh, for Potomac Coal Co., appellee.

David W. Tyree, Pittsburgh, for Clise Coal Company, appellee.

Before JOHNSON, FORD ELLIOTT and HESTER, JJ.

HESTER, Judge.

PNC Bank, N.A., appeals the August 31, 1995 order granting the motion for summary judgment filed by appellees, Potomac Coal Company ("Potomac Coal") and Clise ("Clise")

Coal Company, and denying appellant's motion for summary judgment. In this interpleader action, appellant and Clise claim $81,961.13 currently held in an escrow account. We are asked to determine the enforceability of a future advance or "dragnet clause" in a security agreement executed by Potomac Coal. We conclude that the clause is valid under section 9204(c) of the Uniform Commercial Code ("UCC"), 13 Pa.C.S. §§ 1101, *et seq.*,[1] are constrained to reverse, and award the escrowed funds to appellant.

The procedural history and facts of this case are not disputed. Potomac Edison Company ("Potomac Edison") instituted this interpleader action on February 5, 1993, as both appellant and Potomac Coal were asserting conflicting claims to a payment which was due from Potomac Edison to Potomac Coal under a purchase order contract. Appellant had advised Potomac Edison that it had a security interest in all of Potomac Coal's accounts receivable, including the amount due from Potomac Edison. Potomac Coal had advised Potomac Edison that to the contrary, appellant did not have a valid security interest in its accounts receivable. Accordingly, Potomac Edison, disclaiming any interest in the payment admittedly due under the purchase order, instituted this action and asked that the respective claimants settle their dispute.

After appellant filed an answer, new matter and counterclaim to Potomac Edison's complaint, Potomac Coal filed an answer and new matter alleging that it had assigned all of its right in the Potomac Edison receivable to Clise and that it would no longer claim any interest in the receivable. Clise filed a petition to intervene to assert its claim to the fund. That petition was granted. Clise then filed its answer and counterclaim. After the pleadings were closed, Potomac Edison filed a motion for discharge, which was granted, and the caption of this case was amended. Cross-motions for summary judgment were filed by Clise and Potomac Coal, on the

1. There was some question in the trial court as to whether Maryland or Pennsylvania law should be applied in this action. However, the parties have represented in their briefs to this court that both Maryland and Pennsylvania law on this issue are the same.

one hand, and appellant, on the other hand. When Clise was awarded the funds, this appeal followed.

Potomac Coal, a Pennsylvania corporation, was in the business of buying and selling coal in Pennsylvania, Maryland, and West Virginia, from the late 1970s until 1992, when it ceased operations. James Dean and Charles Moran were the officers and principals of Potomac Coal and had authority to enter into agreements on its behalf.

Potomac Coal and appellant began to do business in the 1980s. On December 28, 1984, Dean and Moran, on behalf of Potomac Coal, executed a secured judgment note payable to appellant in the amount of $800,000. Under the provisions of the note, Potomac Coal had a revolving $800,000 line of credit and promised to repay the principal and outstanding interest on demand. To secure the obligations under the note, Potomac Coal granted appellant a security interest in, among other things, all the accounts, contract rights, and chattel paper then owned by Potomac Coal or any accounts, contract rights, and chattel paper which would be acquired thereafter.

The security interest from Potomac Coal to appellant also was evidenced by a chattel mortgage security agreement and an assignment of accounts, contract rights, and chattel paper. These two documents were executed by Dean and Moran on behalf of Potomac Coal and granted appellant a security interest in, among other things, all of Potomac Coal's present and future accounts, contract rights, and chattel paper, and the proceeds of those items.

In January, 1995, appellant filed UCC financing statements with the Secretary of the Commonwealth of Pennsylvania and with the Office of the Prothonotary of Somerset County, Pennsylvania. These statements indicated that Potomac Coal had given appellant a security interest in all of its accounts, contract rights, and chattel paper which were then owned or which subsequently were to be acquired by Potomac Coal, together with the proceeds therefrom.

In January, 1988, Potomac Coal secured a term loan from appellant in the amount of $200,000. In connection with that

transaction, Potomac Coal executed a security agreement to secure *all* of its obligations to appellant by assignment of, among other things, all of Potomac Coal's present and future accounts, contract rights, and chattel paper. The agreement provides as follows:

> The undersigned [Potomac Coal] does hereby mortgage to [appellant] and grant to it a security interest in all of the goods listed and described hereinafter, ... as security for the payment of *all indebtedness, liabilities or obligations* (all hereinafter called "obligations") of [Potomac Coal], whether direct or contingent, due or to become due, *whether now existing or hereafter arising*, and whether with any other person or not, to [appellant], together with all costs and expenses incurred by [appellant] in the collection of the same,....

Reproduced Record ("R.R.") at 267a (emphases added). This clause commonly is referred to as a future advance clause and also as a "dragnet clause."

The goods described in the 1988 security agreement included, "All machinery, equipment, leases, inventory, *accounts, contract rights and/or chattel paper now owned or hereafter acquired* together with proceeds and products thereof." *Id.* at 268a (emphasis added).

In connection with the 1988 transaction, Potomac Coal, by its two principals, also executed another assignment of accounts, contract rights and chattel paper wherein appellant was granted a security interest in all of Potomac Coal's present and future accounts, contract rights, and chattel paper for all of the indebtedness, liabilities, and obligations of Potomac Coal to appellant.

In the security agreement, Potomac Coal indicated that the goods in which the security interest was being granted were located in Frostburg, Maryland. Accordingly, appellant obtained UCC financing statements from Potomac Coal and filed them with the State of Maryland and the County of Allegany, Maryland, in May, 1988. The financing statements indicate that the debtor was Potomac Coal, the secured party was

appellant, and the property covered by the financing statement was "[a]ll machinery, equipment, leases, inventory, *accounts, contract rights and/or chattel paper now owned or hereafter acquired* together with proceeds and products thereof." *Id.* at 269a, 270a. (emphasis added). In April, 1991, Potomac Coal repaid the 1988 loan but the 1984 revolving line of credit remained outstanding.

In 1992, Potomac secured a contract to supply coal to Potomac Edison. Potomac Coal purchased coal for Potomac Edison from Clise. At the time, Clise did not have a security interest in any of Potomac Coal's assets.

By the end of 1992, Potomac Coal had failed to make payments required under the 1984 judgment note and appellant, after a meeting with Dean, indicated that it would not make any further advances under the line of credit. On December 15, 1992, as permitted under the terms of the 1984 judgment note, appellant demanded all of the outstanding principal and interest due in the amount of $622,178.41.

On December 15, 1992, appellant also sent a letter to Potomac Edison notifying it of appellant's security interest in all accounts due to Potomac Coal. A copy of this letter was sent to Potomac Coal.

On December 28, 1992, counsel for Potomac Coal wrote to Potomac Edison stating that Potomac Coal's indebtedness to appellant had been paid and the amounts owed by Potomac Edison to Potomac Coal should be paid directly to Potomac Coal. Potomac Coal did not make payment to appellant under the 1984 judgment note and as of March 15, 1995, owed $602,835.65 in principal and $112,952.86 in interest, plus costs and attorneys' fees.

On January 4, 1993, an assignment was prepared transferring Potomac Coal's rights in the Potomac Edison account to Clise. A UCC financing statement also was prepared and executed to perfect Clise's security interest in "Accounts Receivable due to Potomac Coal Company from the Potomac Edison Company, Downsville Pike, Hagerstown, MD 21740." *Id.* at 337a, 338a. In July, 1993, after appellant made demand

for payment of its 1984 line of credit, Potomac Coal made a demand on appellant that it file termination statements with respect to the 1988 UCC filings.

■ In deciding this case, the trial court concluded that the 1988 UCC statements filed in Maryland secured only the 1988 loan, which had been paid, and that the 1988 security agreement did not cover the 1984 line of credit. In reaching this conclusion, the trial court indicated that since the "1988 security agreement contained no reference to the 1984 security agreement," the 1988 documents did not relate to the prior indebtedness of Potomac Coal. Trial court opinion, 8/31/95, at 3.

The trial court's decision to view the 1988 documents as relating to only the 1988 indebtedness cannot be sustained in light of the dragnet clause in the 1988 documents. The security agreement contains clear language that "*all indebtedness, liabilities or obligations* (all hereinafter called "obligations") of [Potomac Coal], whether direct or contingent, due or to become due, *whether now existing or hereafter arising*" were secured by the agreement. By this language, which is completely unambiguous, the parties intended that all of Potomac Coal's past and future obligations to appellant would be secured. *See In re Sunshine Books, Ltd.*, 41 B.R. 712 (Bankr. E.D.Pa.1984); *Kitmitto v. First Pennsylvania Bank, N.A.*, 518 F.Supp. 297 (E.D.Pa.1981); *Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231 (W.D.Pa.1975).

In 1988, UCC financing statements were filed in the proper jurisdiction based on this security agreement. The 1988 statements were sufficient under section 9402(a) of the UCC in that they: (1) named the debtor and the secured party; (2) were executed by the debtor; (3) gave the address of the secured party from which any information concerning the security interest could have been obtained, including the fact that future advances and antecedent debt were secured thereby; (4) gave a mailing address of the debtor; and (5) contained a statement indicating the types and describing the items of

collateral. There is no requirement in section 9402(a) that financing statements refer to the specific debt being secured.

The actual issue in this case, then, is whether the future advance or dragnet clause itself is enforceable. In the law relating to real estate mortgages, dragnet clauses are clauses included in mortgages whereby creditors attempt to secure debt unrelated to the original mortgage indebtedness. In the real estate area, these clauses, are widely disfavored since they cloud title. *E.g., In re: Shapiro,* 109 B.R. 127 (Bankr. E.D.Pa.1990).

However, these types of clauses specifically are permitted under section 9204 of the UCC, which states, "**(c) Security agreement may cover future advances.**—Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment...." 13 Pa.C.S. § 9204(c). In the advisory committee note to the precursor of section 9204(c), the committee indicates that the provision was intended to validate future advance clauses like the one at issue herein. Thus, the terms of the security agreement, and specifically provisions regarding future advances, generally are to be considered effective under the UCC. *In re: Sunshine Books, Ltd., supra.*

Subsequent to the enactment of the UCC, however, a "relatedness rule" was developed which reflected the disfavor with which dragnet clauses had been viewed. In *Kitmitto v. First Pennsylvania Bank, N.A., supra,* at 300–01 (footnote omitted), the court comprehensively examined the origin of the relatedness rule as well as the countervailing case law:

> [The "relatedness rule"] serves to limit application of a future advance clause to those advances which are of the same class as the primary transaction. *See, e.g., Marine National Bank v. Airco, Inc.,* 389 F.Supp. 231, 234 (W.D.Pa. 1975); *In re Eshleman,* 10 U.C.C. Rep. 750, 752, 1972 WL 20838 (Bankruptcy E.D.Pa.1972); *Community Bank v. Jones,* 278 Or. 647, 566 P.2d 470, 482 (1977).

The relatedness rule developed prior to the enactment of the Uniform Commercial Code and was a reflection of the

disfavor with which courts viewed future advance or dragnet clauses in security agreements. *See* 12A Pa.Stat.Ann. § 9–204(5) (Purdon 1970) (official comment) (repealed 1979), 2 G. Gilmore, *Security Interests in Personal Property,* § 3513, at 920–21 (1965); Justice, *Secured Transactions—What Floats Can Be Sunk,* 24 Vill.L.Rev. 867, 899 (1979). Upon the enactment of the Code, with its express validation of future advance arrangements which were covered by the agreement, the question arose as to whether the relatedness rule survived. Professor Gilmore, who was one of the principal drafters of Article 9, was of the opinion that it did. He wrote:

> "However 'covered by the security agreement' is to be read, § 9–204(5) should not be taken to overrule the so called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful devise can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangements claims against the debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the courts have regularly curbed such abuses: no matter how the clause is drafted, the future advances to be covered must 'be of the same class as the primary obligation ... and so related to it that the consent of the debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness', vague but useful, should be applied to § 9–204(5)."

2 Gilmore, *supra* at 932.

Adhering to this view, a number of courts have held that the relatedness rule applies to a future advance security agreement under the Code. *See e.g., Marine National Bank v. Airco, Inc.,* 389 F.Supp. 231, 234 (W.D.Pa.1975); *National Bank of Arkansas v. [Blankenship] General Mills, Inc.,* 177 F.Supp. 667 (E.D.Ark.1959), *aff'd sub nom. National Bank of Eastern Arkansas v. General Mills, Inc.,* 283 F.2d 574 (8th Cir.1960); *Community Bank v. Jones,* 278 Or. 647, 566

P.2d 470 (1977); *John Miller Supply Co. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161, 165 (1972). Other courts, however, have applied the parol evidence rule and have held that unambiguous future advance clauses cover all future advances. *See, e.g., In re Riss Tanning Corp.*, 468 F.2d 1211, 1213 (2d Cir.1972) (applying New York law); *In re Public Leasing Corporation*, 488 F.2d 1369, 1377–1378 (10th Cir.1973) (applying Oklahoma law).

We believe that the better-reasoned approach is the one applying the relatedness test, and we conclude that the 1984 loan at issue herein was sufficiently related to the 1988 loan that the 1988 security agreement should be construed as encompassing that loan. Thus, the future advance clause at issue herein is valid.

Normally, loans are considered related if the loans have been secured to provide working capital for the same business venture. *See Marine National Bank v. Airco, Inc., supra; see also In re Southwest Pennsylvania Natural Resources, Inc.*, 11 B.R. 900 (Bankr.W.D.Pa.1981). On the other hand, if one contractual liability is secured to purchase a personal item and another is secured to purchase a business item, the contractual liabilities are not considered related. *See In re Grizaffi*, 23 B.R. 137 (Bankr.D.Colo.1982). Herein, the loans were secured by the principals of a coal brokerage business to provide working capital for that business. Accordingly, the relatedness test is satisfied, the future advance clause is enforceable, the security agreement covered the 1984 and 1988 loans, and the UCC financing statements filed in Maryland in 1988 remained valid with respect to the outstanding 1984 indebtedness even though the 1988 term loan had been paid.

Potomac Coal also argues that the assignment of the Potomac Edison account receivable to Clise is outside the ambit of the UCC pursuant to section 9–104(f), which provides in relevant part that the provisions of Article 9 do not apply to "a transfer of a single account to an assignee in whole or partial

satisfaction of a preexisting indebtedness." 13 Pa.C.S. § 9104(6).

In the present case, Potomac Coal assigned all of "its right, title, and interest in" the account receivable at issue. R.R. at 336a. However, Potomac Coal's right to the account receivable was subject to the 1988 security agreement, and therefore, Clise's right to the account remained subject to that agreement. Accordingly, this argument fails.

Order reversed. Judgment entered in favor of PNC Bank, N.A. Jurisdiction relinquished.