In re Scott M. FASSINGER, Debtor.

Allegheny–Ludlum Brackenridge
Federal Credit Union,
Movant,

v.

Scott M. Fassinger, Respondent.

Scott M. Fassinger, Plaintiff,

v.

Allegheny–Ludlum Brackenridge
Federal Credit Union,
Defendant.

Bankruptcy No. 99–27173–MBM.
Motion No. 99–5702M.
Adversary No. 99–2466MBM.

United States Bankruptcy Court,
W.D. Pennsylvania,
Pittsburgh Division.

March 27, 2000.

Laurel Hartshorn, Saxonburg, PA, for Scott M. Fassinger.

Diane Aiello, Joseph P. Covelli, Pittsburgh, PA, for Allegheny–Ludlum Brackenridge Federal Credit Union.

### MEMORANDUM OPINION

M. BRUCE McCULLOUGH,
Bankruptcy Judge.

Allegheny–Ludlum Brackenridge Federal Credit Union (hereafter "Allegheny") moves for relief from the automatic stay in the above-captioned bankruptcy case (Motion No. 99–5702M) so that it may proceed with its rights in state court with respect to two vehicles (a) which are presently owned by Scott Fassinger, the instant debtor, and (b) in which Allegheny has security interests. At the same time, the instant debtor, via the above-captioned ad-

versary proceeding (Adversary No. 99–2466MBM), seeks a determination by this Court regarding the extent of Allegheny's security interests in the aforesaid vehicles. The debtor, via its adversary complaint, essentially requests that this Court (a) invalidate, or refuse to enforce, clauses that Allegheny has placed in security agreements pertaining to the two vehicles in question, which clauses, commonly referred to as "dragnet" clauses, purport to cross collateralize with the aforesaid vehicles each of four pre-petition loans between the parties, (b) conclude, as a consequence of the preceding invalidation, that (i) the debtor possesses equity in the two vehicles in question, and (ii) two of the four aforesaid loans are not secured by either of the aforesaid two vehicles, and (c) direct Allegheny, also as a consequence of the preceding invalidation, to return to the debtor all post-petition payments pertaining to one of the two aforesaid loans not secured by either vehicle in question that have been exacted by Allegheny from the debtor via a wage deduction arrangement. A determination by the Court as to the enforceability of the aforesaid dragnet clauses, and thus the extent of Allegheny's security interests in the aforesaid vehicles, bears heavily upon the Court's resolution of Allegheny's stay relief motion because Allegheny contends that (a) the debtor, by operation of said dragnet clauses, does not have any equity in either of the aforesaid vehicles, and (b) stay relief is thus appropriate under 11 U.S.C. § 362(d)(2). Therefore, the Court will dispose of the debtor's adversary complaint and Allegheny's stay relief motion simultaneously via the instant opinion and accompanying order.

### STATEMENT OF FACTS

The debtor, who was a member of Allegheny prior to the September 27, 1999 commencement of the instant bankruptcy case, obtained four separate loans from Allegheny prior to said commencement date. The first extension of credit by Allegheny to the debtor occurred on or about June 21, 1994, in the form of a $1,000 line of credit accessed via a VISA credit card account with Allegheny (hereafter "the VISA Credit Card Account"); the VISA Credit Card Account was subsequently increased to $5,000 on October 21, 1994. The debtor obtained the other three loans from Allegheny of $24,562.46, $6,726.64, and $6,000, respectively, on or about April 1, 1997, September 23, 1997, and February 24, 1998, respectively (hereafter "the April 1, 1997, September 23, 1997, and/or February 24, 1998 Loans").

In order to obtain the VISA Credit Card Account, the debtor filled out a Credit Card Application (hereafter "the Credit Card Application"). In order to obtain the April 1, 1997, September 23, 1997, and February 24, 1998 Loans, the debtor completed and executed with respect to each of said loans a document entitled "Consumer Credit Disclosure Form, Promissory Note and Security Agreement" (hereafter "Note and Security Agreement" or, collectively, "the Note and Security Agreements"). Each of the Note and Security Agreements are one-page documents containing typewritten information on the front of said documents and pre-printed, standard form language on the back thereof.

With respect to the Credit Card Application, there is neither (a) a space therein for a description of collateral offered by an applicant to secure the VISA Credit Card Account, nor (b) any indication therein by the instant debtor that he would provide collateral for his VISA Credit Card Account. *See* Ex. F to Alleg.Mot. R/S. However, in paragraph 9 of a document entitled "VISA Credit Card Agreement" (hereafter "the VISA Credit Card Agreement"), which document the debtor alleges that he never received, the following pre-printed language is found:

*Security Interest.* If you give the Credit Union a specific pledge of shares by signing a separate pledge of shares, your Account will be secured by your

pledged shares. Collateral securing other loans you have with the Credit Union *may* also secure this loan, except that your home will never be considered as security for this Account, notwithstanding anything to the contrary in any other agreement.

*See* Alleg.Ex. D (filed Feb. 3, 2000) (emphasis added). The last sentence from the preceding contractual language shall be referred to henceforth as "the Cross–Collateralization Clause" in the VISA Credit Card Agreement.

With respect to the Note and Security Agreements that accompany the April 1, 1997, September 23, 1997, and February 24, 1998 Loans, the following information pertaining to collateral is contained on the front of each of said documents:

(a) The following pre-printed language is contained in the section for each of said documents entitled "Truth–In–Lending Disclosure," to wit that "Collateral securing other loans with the credit union *may* also secure this loan. You *are* giving a security interest in your shares and/or deposit in this credit union; and ☐ the goods or property being purchased; [and] ☐ Other (Describe)." Neither box is checked for any of the three loans in question. Furthermore, nothing is typewritten next to any of the pre-printed language for the April 1, 1997 Loan. However, "TL. INS. $50.00 SHARES # 10138" is typewritten next to the pre-printed language "Other (Describe)" for the September 23, 1997 Loan, and "$50.00 SHARES # 10138 CO–SIGNER" is typewritten next to the pre-printed language "Other (De-

scribe)" for the February 24, 1998 Loan. *See* Ex's. A, C & E to Alleg.Mot. R/S (emphasis added).

(b) In the section for each of said documents entitled "Note (Continued on Reverse Side)" the following is typewritten under the heading "Security Offered," to wit (i) for the April 1, 1997 Loan, only a 1997 Dodge (hereafter "the 1997 Dodge"), which vehicle the debtor purchased with the funds from said loan, (ii) for the September 23, 1997 Loan, only a 1997 Kawasaki (hereafter "the 1997 Kawasaki"), which vehicle the debtor purchased with the funds from said loan,[1] and (iii) for the February 24, 1998 Loan, collateral was not offered but the presence of a co-signer is indicated.[2] *See* Ex's. A, C & E to Alleg.Mot. R/S.

(c) In the same section for each of said documents (i.e., "Note ...") the debtor indicated that he pledged shares and/or deposits of $50.00, Acct. # 10138–1. *See* Ex's. A, C & E to Alleg.Mot. R/S.

The following pertinent pre-printed language is contained in the section entitled "Note (Continued)" which is found on the reverse of each of the three Note and Security Agreements, to wit:

Security Interest—Any property shown in the "Security Offered" section on the reverse side will be security for this loan. In addition, you agree this loan is also secured by all the shares and deposits in all your individual and joint accounts with the credit union now and in the future.... Property you have given to secure other loans will also secure this loan.[3]

---

1. Allegheny perfected its security interest in the 1997 Dodge and 1997 Kawasaki pre-petition by making a proper notation of its lien on each vehicle's Pennsylvania Transportation Department Certificate of Title. *See* Ex's. B & D to Alleg.Mot. R/S.

2. The debtor apparently used the funds from the February 24, 1998 Loan to purchase home improvements.

3. For the Note and Security Agreement accompanying the February 24, 1998 Loan the language in the sentence immediately preceding the instant footnote is somewhat different than, but significantly identical to, that con-

*See* Alleg.Ex's. A–C (filed Feb. 3, 2000). The last sentence from the preceding contractual language shall be referred to henceforth as "the Cross–Collateralization Clause" in the April 1, 1997, September 23, 1997, and February 24, 1998 Note and Security Agreements. The following pertinent pre-printed language is contained in the section entitled "Security Agreement" which is found on the reverse of each of the three Note and Security Agreements, to wit:

> **The Security for the Loan**—By signing this security agreement in the signature area . . . , you give the credit union what is known as a security interest in the property described in the "Security Offered" section. . . .

> **What the Security Interest Covers**— The security interest secures the loan described in the Truth in Lending Disclosure and any extensions, renewals or refinancings of that loan. *It also secures any other loans you have with the credit union now or in the future and any other amounts you owe the credit union for any reason now or in the future.* If the property description is marked with one star (\*), or the property is household goods as defined by the Credit Practice Rule, the property will secure only this loan and not other amounts you owe.[4]

*See* Alleg.Ex's. A–C (filed Feb. 3, 2000) (emphasis added).

The preceding italicized language that purports to extend Allegheny's security interests, as defined above, such that they shall secure all loans that the debtor has, or will have in the future, with Allegheny (in addition to the loan in connection with which the security agreement was executed), is commonly referred to as a "dragnet" clause. *See In re Shapiro,* 109 B.R. 127, 128 & 132 (Bankr.E.D.Pa.1990) ("A dragnet clause may purport to embrace either past indebtedness of the obligor to the obligee, or future indebtedness of the obligor to the obligee, or both"); *In re Cara Corp.,* 148 B.R. 779, 781 (Bankr. E.D.Pa.1992). The Court shall henceforth refer to the dragnet clauses found in the three Note and Security Agreements as "the Dragnet Clauses."

The debtor contends that he owed $16,324.74 on the April 1, 1997 Loan as of his petition filing date. *See* Deb. Bankr.Sch. D. The Court shall presume that Allegheny agrees with the debtor's preceding assertion regarding said loan balance because (a) Allegheny has not asserted otherwise, and (b) Allegheny asserts that the total outstanding balance for the four loans described above is $32,074.72, *see* Alleg.Mot. R/S, at ¶ 13, which figure is less than the total of the debtor's own asserted balances for said loans of $32,603.97 as reflected in his bankruptcy schedules. *See* Deb. Bankr.Schs. D & F. That the debtor's calculation of his total balance for all four of the loans in question exceeds that of Allegheny is perhaps explained by (a) the

---

tained in the corresponding sentence found in the April 1, 1997 and September 23, 1997 Note and Security Agreements. *See* Alleg.Ex. C (filed Feb. 3, 2000).

4. The property descriptions of the 1997 Dodge and the 1997 Kawasaki found respectively on the face of the April 1, 1997 and September 23, 1997 Note and Security Agreements are not marked with a star (\*). *See* Ex's. A & C to Alleg.Mot. R/S. Furthermore, neither vehicle constitutes a household good as defined by the Credit Practices Rule of the Federal Reserve Board of Governors. *See* Federal Reserve Credit Practices Rule, Regulation AA, Subpart B, 12 C.F.R. § 227.12(d) &

Q12(d)–3 (2000) (" 'Household goods' means clothing, furniture, appliances, linens, china, crockery, kitchenware, and personal effects of the consumer" and " 'personal effects' is to be narrowly construed and is limited to those items that an individual would ordinarily carry about on his or her person and possessions of a uniquely personal nature"). Therefore, and based on this contractual language, Allegheny asserts that its security interests in the 1997 Dodge and the 1997 Kawasaki secure not only the loans in connection with which security agreements pertaining to said vehicles were executed but also all other loans between Allegheny and the debtor.

possibility that Allegheny's figure is computed as of December 3, 1999, rather than the debtor's September 27, 1999 petition filing date, and (b) the fact that the debtor continues to make payments on the April 1, 1997 Loan post-petition via wage deduction, which fact (i) is stipulated to by both parties, see Deb. Adv.Compl., at ¶ 5; Alleg.Resp., at ¶ 5, and (ii) necessarily means that the outstanding balance on said loan has decreased since the debtor's petition filing. The debtor and Allegheny also agree that the present value of the 1997 Dodge, which vehicle both parties agree secures the April 1, 1997 Loan, is $16,540.[5] See Deb.Adv.Compl., at ¶ 2; Alleg.Resp., at ¶ 2.

The debtor contends that he owed $5,000 on the September 23, 1997 Loan as of his petition filing date, see Deb.Bankr. Sch. D, which contention the Court shall presume that Allegheny agrees with for the same reasons that the Court makes a similar presumption with respect to the April 1, 1997 Loan. See supra pp. 517–518. As with the April 1, 1997 Loan, the debtor continues to make payments on the September 23, 1997 Loan post-petition via wage deduction, see Deb.Adv.Compl., at ¶ 5; Alleg.Resp., at ¶ 5, which necessarily means that the outstanding balance on said loan has decreased since the debtor's petition filing. The debtor and Allegheny disagree as to the present value of the 1997 Kawasaki, which vehicle both parties agree secures the September 23, 1997 Loan, with the debtor offering a $2,000 valuation, see Deb.Adv.Compl., at ¶ 2, and Allegheny offering a $6,700 valuation. See Alleg.Mot. R/S, at ¶ 7.

The debtor contends that he owed $6,000 on the February 24, 1998 Loan as of his petition filing date, see Deb.Bankr.Sch. F, which contention the Court shall presume that Allegheny agrees with for the

same reasons that the Court makes similar presumptions with respect to the April 1, 1997 and September 23, 1997 Loans. See supra pp. 517–518. As with the April 1, 1997 and September 23, 1997 Loans, the debtor continues to make payments on the February 24, 1998 Loan post-petition via wage deduction, see Deb.Adv.Compl., at ¶ 5; Alleg.Resp., at ¶ 5, which necessarily means that the outstanding balance on said loan has decreased since the debtor's petition filing. The parties disagree with respect to the outstanding balance on the VISA Credit Card Account, with the debtor alleging a $5,279.23 balance as of his petition filing date, see Deb.Bankr.Sch. F, and Allegheny alleging a $6,503.81 balance apparently as of December 3, 1999. See Alleg.Mot. R/S, at ¶ 11. Unlike the other three loans in question, the debtor does not continue to make post-petition payments on the VISA Credit Card Account.

### DISCUSSION

On the basis of the preceding statement of facts, the Court concludes that the debtor, both as of his petition filing and at the present time, possesses some equity in the 1997 Dodge provided that said vehicle secures only the April 1, 1997 Loan (i.e., $16,540 vehicle value less loan balance of $16,324.74 or less). On the basis of the preceding statement of facts, the Court also concludes that the debtor, both as of his petition filing and at the present time, possesses some equity in the 1997 Kawasaki provided that (a) Allegheny's $6,700 valuation with respect to said vehicle is accepted, which valuation the Court shall accept given that it is offered by Allegheny and Allegheny has the burden of proving a lack of equity on the debtor's part in said vehicle pursuant to 11 U.S.C. § 362(g)(1), see infra pp. 519–520, and (b) said vehicle secures only the September 23, 1997 Loan (i.e., $6,700 vehicle value less loan balance of $5,000 or less). Given the preceding

---

5. Despite Allegheny's assertion in its stay relief motion that the 1997 Dodge is worth $16,000, see Alleg.Mot. R/S, at ¶ 4, Allegheny subsequently conceded, in its answer to the

debtor's adversary complaint, that said vehicle is worth $16,540 as alleged by the debtor in his adversary complaint. See Alleg.Resp., at ¶ 2.

two conclusions, Allegheny cannot succeed in obtaining relief from stay at this time on the basis that the debtor lacks equity in the 1997 Dodge and the 1997 Kawasaki unless said vehicles, via the April 1, 1997 and September 23, 1997 Dragnet Clauses, constitute collateral for each of the four pre-petition loans obtained by the debtor from Allegheny.[6]

According to the clear language of the April 1, 1997 and September 23, 1997 Dragnet Clauses, the two vehicles in question constitute collateral for each of the four pre-petition loans in question. Notwithstanding said plain language, an issue exists, as will subsequently be explained, as to the enforceability of said Dragnet Clauses with respect to the two aforesaid vehicles. *See infra* pp. 521–522. Therefore, the Court shall endeavor to ascertain whether said Dragnet Clauses may be enforced. If said Dragnet Clauses are enforceable, then (a) the debtor unquestionably lacks equity in the 1997 Dodge and the 1997 Kawasaki because the debtor's consequentially encumbered debt equals an amount approximating $32,603.97, *see supra* p. 517, which amount exceeds $23,240 (i.e., the value of said vehicles, or the sum of $16,540 and $6,700), and (b) Allegheny is entitled to immediate relief from stay pursuant to § 362(d)(2). However, if said Dragnet Clauses are not enforceable, then (a) Allegheny is not entitled to the stay relief that it seeks via § 362(d)(2) given that the debtor would possess equity in the 1997 Dodge and the 1997 Kawasaki, and (b) the February 24, 1998 Loan and the VISA Credit Card Account are not secured by the 1997 Dodge and/or the 1997 Kawasaki, given that said loans are not otherwise secured by said vehicles. Furthermore, if the February 24, 1998 Loan is not secured by either the 1997 Dodge or the 1997 Kawasaki—and said loan would not be so secured if said Dragnet Clauses are not enforceable—then the debtor would be entitled to a return of, and Allegheny would then need to reimburse the debtor for, all post-petition wage deductions exacted by Allegheny in payment of the February 24, 1998 Loan, given that the debtor would not be contractually obligated to make said payments in order to retain either of the aforesaid vehicles postpetition. Notwithstanding the immediately preceding holding, the Court cannot, in any event, agree with the debtor's assertion in his adversary complaint that the February 24, 1998 Loan is unsecured, *see* Deb.Adv.Compl., at ¶ 3; to the contrary, said loan is still secured by the debtor's shares and deposits in his accounts with Allegheny regardless of whether the April 1, 1997 and September 23, 1997 Dragnet Clauses are enforceable.[7] *See* Ex. E to Alleg.Mot. R/S; Alleg.Ex. C (filed Feb. 3, 2000).

With respect to both Allegheny's stay relief motion and the debtor's adversary complaint, Allegheny has the burden of proof, which burden is actually that of persuasion, regarding the enforceability of the April 1, 1997 and September 23, 1997 Dragnet Clauses. The preceding conclu-

---

**6.** The February 24, 1998 Dragnet Clause is irrelevant to the cross collateralization issue raised by the parties because (a) said clause appears in the security agreement portion of the February 24, 1998 Note and Security Agreement, (b) neither the 1997 Dodge nor the 1997 Kawasaki is listed in the "Security Offered" section on the front of the February 24, 1998 Note and Security Agreement, *see* Ex. E to Alleg.Mot. R/S, which means that the security agreement contained within said document did not grant, and could not have granted, to Allegheny a security interest in said vehicles, and (c) Allegheny obtained security interests in the 1997 Dodge and the 1997 Kawasaki, respectively, via the respective se-

curity agreements in the two preceding Note and Security Agreements. *See* Ex's. A & C to Alleg.Mot. R/S; Alleg.Ex's. A & B (filed Feb. 3, 2000).

**7.** According to the February 24, 1998 Note and Security Agreement, Allegheny obtained a co-signature on the note for the February 24, 1998 Loan. *See* Ex. E to Alleg.Mot. R/S. The liability of said cosigner on said note, of course, will not be impacted by either the debtor's Chapter 7 discharge or the automatic stay imposed as a result of the instant bankruptcy case.

sion follows with respect to Allegheny's stay relief motion because (a) § 362(g)(1) places upon Allegheny, as the party requesting stay relief under § 362(d)(2), the burden of proving that the debtor lacks equity in the 1997 Dodge and the 1997 Kawasaki, *see* 11 U.S.C.A. § 362(g)(1) (West 1993), and (b) Allegheny, in order to demonstrate that the debtor lacks equity in the two vehicles in question, must necessarily demonstrate that the April 1, 1997 and September 23, 1997 Dragnet Clauses are enforceable. *See supra* pp. 518–519. The preceding conclusion regarding burden of proof also follows with respect to the debtor's adversary complaint, wherein the debtor seeks a determination by the Court regarding the extent of Allegheny's security interests in the aforesaid vehicles, because (a) the precise nature of the debtor's adversary's complaint is, as the debtor notes therein, a request for a determination of Allegheny's secured status under 11 U.S.C. § 506, (b) in a proceeding to determine secured status under § 506, "the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim" provided that the debtor first satisfies an "initial burden of proof to overcome the presumed validity and amount of the creditor's secured claim," [8] *see In re Robertson,* 135 B.R. 350, 352 (Bankr. E.D.Ark.1992) (citing *In re Schaumburg Hotel Owner Limited Partnership,* 97 B.R. 943, 950 (Bankr.N.D.Ill.1989)); *see also In re Lampert,* 61 B.R. 785, 787 (Bankr. W.D.Wis.1986) (same); *In re Buick, Inc.,* 126 B.R. 840, 851 (Bankr.E.D.Pa.1991) ("Throughout the [Bankruptcy] Code, the burden of proving the 'validity, priority, and extent' of security interests lies upon the creditors asserting such interests"); *In re Union Meeting Partners,* 178 B.R. 664, 677 (Bankr.E.D.Pa.1995) (same), (c) the extent to which Allegheny contends its

four loans with the debtor are secured depends entirely upon the enforceability of the April 1, 1997 and September 23, 1997 Dragnet Clauses, *see supra* pp. 518–519, and (d) the debtor has easily satisfied his aforesaid initial burden given that (i) dragnet clauses are often not enforced, even with respect to security interests in personal property, *see infra* pp. 520–522, and (ii) Allegheny's four loans to the debtor will not be secured to the extent contended by Allegheny unless the April 1, 1997 and September 23, 1997 Dragnet Clauses are enforceable. *See supra* pp. 518–519.

**I. The Law Relating to the Enforceability of Dragnet Clauses.**

 "In the real estate area, ... [dragnet] clauses are widely disfavored since they cloud title." *Potomac Coal Co. v. $81,961.13 in the Hands of an Escrow Agent,* 451 Pa.Super. 289, 679 A.2d 800, 803 (1996) (citing *Shapiro,* 109 B.R. 127). "However, these types of clauses specifically are permitted under section 9204 of [Pennsylvania's version of] the UCC [(i.e., Uniform Commercial Code)], which states [that] '[o]bligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment....'" *Id.* (citing 13 Pa.Cons.Stat. Ann. § 9204(c)).

 Notwithstanding the language of § 9204(c) of the UCC, many courts—including apparently all of those that have applied Pennsylvania law—have subjected dragnet clauses in security agreements to a "relatedness rule." *See Kitmitto v. First Pennsylvania Bank, N.A.,* 518 F.Supp. 297, 301 (E.D.Pa.1981) (concluding that "[t]he Pennsylvania Supreme Court[, which] has expressly avoided the question of whether a broadly worded future advance clause covers non-related advances

---

**8.** The debtor's aforesaid initial burden of proof is that to which the Court refers on page 2 of its January 27, 2000 Order of Court. *See* Jan. 27, 2000 Order of Court, at 2 ("the

debtor's burden to prove, *inter alia,* that loan documents signed by the debtor do not provide Allegheny with the security interests that Allegheny alleges that it has").

under the Code[,] ... would apply the relatedness rule in an applicable case;" in support of said conclusion, numerous cases are cited including, *inter alia, Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231, 234 (W.D.Pa.1975)); *Potomac Coal Co.*, 679 A.2d at 804 (citing *Kitmitto*); *Cara Corp.*, 148 B.R. at 782; *Winkelspecht v. Postmark Federal Credit Union (In re Winkelspecht)*, Case No. 97–00027, Adv. No. 97–00102A (Bankr.M.D.Pa.4/13/98), at 4.[9] The "'relatedness rule' was developed ... [to] reflect[ ] the disfavor with which dragnet clauses had been viewed," *Potomac Coal Co.*, 679 A.2d at 804, and is used to curb the abusive utilization of dragnet clauses by lenders who "'seek[ ] to bring within the shelter of ... [their] security arrangements claims against the debtor which are unrelated to the course of financing that was contemplated by the parties.'" *Kitmitto*, 518 F.Supp. at 301 (citing 2 G. Gilmore, *Security Interests in Personal Property*, § 3513, at 932 (1965)). Stating the "relatedness rule" succinctly, in order for a dragnet clause to be enforceable, "'no matter how the clause is drafted, the future advances to be covered [under said clause] must "be [(a)] of the same class as the primary obligation [(i.e., the debt in connection with which the security agreement containing said dragnet clause is executed)] ... [,] and [(b)] so related to it [(i.e., the primary obligation)] that the consent of the debtor to its [(i.e., said future advances)] inclusion [under said clause] may be inferred."'" *Id.; see also Winkelspecht, supra*, at 4–5 ("In Pennsylvania, dragnet clauses are recognized as valid and enforceable if the advances [sought to be included within the reach of said clauses] are related to the purpose of the original loan agreement").

■ The following test (hereafter "the Four–Part Test") has been developed in conjunction with the "relatedness rule" to determine whether advances sought to be covered under a dragnet clause are (a) of the same class as the primary obligation (i.e., the debt in connection with which the security agreement containing said dragnet clause is executed), and (b) so related to the primary obligation that the consent

**9.** The Court is somewhat astonished by, and simply must disagree with, Allegheny's contention, as set forth on page 6 of its memorandum in support of its stay relief motion, that the "relatedness rule" has been "judicially abrogated." Allegheny apparently cites as supportive of its preceding position language from the decisions in *Winkelspecht* and *In re Sunshine Books, Ltd.*, 41 B.R. 712 (Bankr. E.D.Pa.1984). Unfortunately for Allegheny, the courts in *Winkelspecht* and *Sunshine Books* neither purported to, nor did in fact, abrogate the "relatedness rule." In fact, both of these courts actually recognized and then proceeded to apply the "relatedness rule" to the factual situations that they encountered. *Winkelspecht, supra*, at 4–7; *Sunshine Books*, 41 B.R. at 714 (abbreviated application of the "relatedness rule" notwithstanding skepticism as to the applicability of said rule subsequent to enactment of the UCC). Allegheny is correct that the *Winkelspecht* court concluded that the term "relatedness" should "not [ ] be strictly construed" when addressing the enforceability of a dragnet clause. *See Winkelspecht, supra*, at 5. However, the *Winkelspecht* court, by concluding as it did, meant to suggest neither (a) that the "relatedness rule" should be applied in a relaxed fashion, particularly given that the *Winkelspecht* court itself proceeded to apply said rule in a detailed fashion, *see Id.* at 5–7, nor (b) that the "relatedness rule" has been judicially abrogated. Furthermore, the Court is unaware of any case authority construing Pennsylvania law that either has purported to judicially abrogate said rule, or has concluded that said rule has been judicially abrogated. Therefore, Allegheny's position that the "relatedness rule" has been judicially abrogated must be rejected by this Court.

Allegheny also appears to argue at the same point in its aforesaid memorandum that the "relatedness rule" has been abrogated statutorily by the enactment in Pennsylvania of 13 Pa.C.S.A. § 9204(c). Unfortunately for Allegheny, such statutory abrogation also has not occurred. Instead, § 9204(c) of the UCC is interpreted, at least in Pennsylvania, such that its enactment *does not overrule* the pre-UCC dragnet clause cases, which cases uniformly apply the "relatedness rule." *See, e.g., Potomac Coal Co.*, 679 A.2d at 804 (citing *Kitmitto*). Therefore, the "relatedness rule" remains as a legal hurdle that must be overcome by any creditor wishing to have enforced a dragnet clause that pertains to a security interest in personal property.

of the debtor to the inclusion of said future advances under said clause may be inferred:

"(1) Whether the other indebtednesses allegedly covered by the ... [security agreement containing said dragnet clause] are [specifically expressed] therein ...; (2) Whether the other indebtednesses allegedly covered are 'of the same class' as the debt referenced in the ... [security agreement] ...; (3) Whether the other indebtednesses were intended to be separately secured ...; and (4) Whether the ... [secured party] relied on the clause in making further loans...."

*Cara Corp.*, 148 B.R. at 782 (citing *Shapiro*, 109 B.R. at 134).

## II. *The Types of Evidence that the Court May Consider.*

■ Before the Court proceeds to apply the "relatedness rule" and the Four–Part Test to the April 1, 1997 and September 23, 1997 Dragnet Clauses, the Court must also determine precisely what kind of evidence that it can consider when so applying the "relatedness rule" and the Four–Part Test. Some courts approve of the taking of testimonial evidence when applying the above rule and test. *See, e.g., In re Grizaffi*, 23 B.R. 137, 139 (Bankr. D.Colo.1982). However, other courts, by virtue of what they consider to be a strict application of the parol evidence rule, hold that testimonial evidence of the parties may not be admitted and that recourse may only be had to relevant documentary evidence. *See In re Conte*, 217 B.R. 767, 770 (Bankr.E.D.Tex.1998) (citing *Kimbell Foods, Inc. v. Republic National Bank*, 557 F.2d 491 (5th Cir.1977)). This Court cannot agree that the parol evidence rule should, or even actually can, be strictly respected when applying the "relatedness rule" and the Four–Part Test to a dragnet clause because (a) the application of said rule and test necessarily dictates that loan documents for indebtednesses other than the primary obligation be considered, such as when determining whether (i) the other indebtednesses were intended to be separately secured, and (ii) the secured party relied on the dragnet clause in making further loans, (b) the documentation for said other indebtednesses is obviously evidence that is found outside of the four corners of the document (i) memorializing the primary obligation, and (ii) containing the dragnet clause at issue, *see Kitmitto*, 518 F.Supp. at 301–02 ("the parties will not be presumed, through rigid application of the parol evidence rule, to have intended that non-related advances be covered by the agreement"), (c) evidence outside of the four corners of a particular document, by definition, is parol or extrinsic evidence, *see Black's Law Dictionary* 586, 588 & 1117 (6th ed.1990) (definition of parol, extrinsic, and extraneous evidence), and (d) the issue of the enforceability of an otherwise clearly-worded dragnet clause is similar to, if not subsumed within, the broader issue of whether a portion of a written contract may be invalidated, for which issue parol evidence is admissible. *See* 15 P.L.E. *Evidence* § 301 (West 1959). Therefore, this Court will not look to the parol evidence rule as a basis for any decision on its part in the instant matters to bar the taking of testimonial evidence and to confine itself to only a consideration of relevant documentary evidence. Nevertheless, the Court will confine itself in the instant matters to only a consideration of the three Note and Security Agreements, the Credit Card Application, and the VISA Credit Card Agreement, as well as to any inferences that can be drawn therefrom, because the taking of testimonial evidence is (a) irrelevant to an application of the first two parts of the Four–Part Test, and (b) unnecessary in the instant matters with respect to the last two parts of the Four–Part Test. *See infra* 526 & 526–527. Because the aforesaid documents have now been submitted to the Court for its review, and since testimony will not be taken, the Court may now proceed to resolve whether the April 1, 1997 and September 23, 1997 Dragnet Clauses are enforceable.

**III.** *Whether the April 1, 1997 and September 23, 1997 Dragnet Clauses are Enforceable?*

■ Applying the "relatedness rule" and the Four–Part Test to the April 1, 1997 and September 23, 1997 Dragnet Clauses, and considering only the three Note and Security Agreements, the Credit Card Application, the VISA Credit Card Agreement, and any inferences that can be drawn therefrom, the Court concludes that said Dragnet Clauses are not enforceable. The Court's rationale for the preceding decision follows.

**A.** *Whether the other indebtednesses allegedly covered by the security agreements containing the aforesaid dragnet clauses are specifically expressed therein?*

There is no specific reference to the VISA Credit Card Account in any portion of the "Security Agreement" sections of either the April 1, 1997 or the September 23, 1997 Note and Security Agreements, including, in particular, the Dragnet Clauses found therein, *see* Alleg.Ex's. A & B (filed Feb. 3, 2000), despite the fact that (a) the VISA Credit Card Account was established between Allegheny and the debtor approximately three years prior to either of the loans in connection with which said Note and Security Agreements were drafted, *see supra* p. 515, and (b) such specific references thus could have been made therein. Similarly, there is no specific reference to the April 1, 1997 Loan in either the Dragnet Clause found within, or any other part of the "Security Agree-

ment" section of, the September 23, 1997 Note and Security Agreement, *see* Alleg.Ex. B (filed Feb. 3, 2000), despite the fact that (a) the April 1, 1997 Loan obviously preceded the loan in connection with which the September 23, 1997 Note and Security Agreement was drafted, and (b) such a specific reference thus could have been made therein. The absence of the specific references to which were just alluded leaves the very general and inconspicuous April 1, 1997 and September 23, 1997 Dragnet Clauses, as well as the equally general and inconspicuous Cross–Collateralization Clauses in the VISA Credit Card Agreement and the April 1, 1997 Note and Security Agreement, as the only indication that (a) the 1997 Dodge *will* collateralize, *inter alia*, the VISA Credit Card Account, and (b) the 1997 Kawasaki *will* collateralize, *inter alia*, the VISA Credit Card Account and the April 1, 1997 Loan.[10] Therefore, the April 1, 1997 and September 23, 1997 Dragnet Clauses fail the first part of the Four–Part Test with respect to advances made prior to the execution of the respective Note and Security Agreements containing said Dragnet Clauses.

Analogously, there is no specific reference to the 1997 Dodge in the "Security Offered" section on the front of either the September 23, 1997 or the February 24, 1998 Note and Security Agreements, *see* Ex's. C & E to Alleg.Mot. R/S, despite the fact that (a) said vehicle had already been offered by the debtor as collateral for the preexisting April 1, 1997 Loan, and (b) such a specific reference thus could have

**10.** The pre-printed language contained on the front of the April 1, 1997 Note and Security Agreement, in the section entitled "Truth–In–Lending Disclosure," to the effect that "[c]ollateral securing other loans with the credit union *may* also secure this loan," is in contradistinction to the Cross–Collateralization Clause found on the back of the same document, wherein an indication is made that cross collateralization *will*, not *may*, occur. Thus, the aforesaid language on the front of the April 1, 1997 Note and Security Agreement does not even serve to provide a general

indication that the 1997 Kawasaki *will* collateralize, *inter alia*, the April 1, 1997 Loan. The Court also notes that the Cross–Collateralization Clause in the VISA Credit Card Agreement similarly uses the word "may" rather than "will" when discussing whether cross collateralization will occur with respect to the VISA Credit Card Account, which means that said cross collateralization clause is not only general and inconspicuous but also ineffective as an indication that cross collateralization will occur.

been made therein if Allegheny desired to cross collateralize the September 23, 1997 and February 24, 1998 Loans with the 1997 Dodge. Similarly, there is no specific reference to the 1997 Kawasaki in the "Security Offered" section on the front of the February 24, 1998 Note and Security Agreement, *see* Ex. E to Alleg.Mot. R/S, despite the fact that (a) said vehicle had already been offered by the debtor as collateral for the preexisting September 23, 1997 Loan, and (b) such a specific reference thus could have been made therein if Allegheny desired to cross collateralize the February 24, 1998 Loan with the 1997 Kawasaki. The absence of the specific references to which were just alluded leaves the very general and inconspicuous April 1, 1997 and September 23, 1997 Dragnet Clauses, as well as the equally general and inconspicuous Cross–Collateralization Clauses in the September 23, 1997 and February 24, 1998 Note and Security Agreements, as the only indication that (a) the 1997 Dodge *will* collateralize, *inter alia*, the September 23, 1997 and February 24, 1998 Loans, and (b) the 1997 Kawasaki *will* collateralize, *inter alia*, the February 24, 1998 Loan.[11] Therefore, the April 1, 1997 and September 23, 1997 Dragnet Clauses fail the first part of the Four–Part Test with respect to advances made subsequent to the execution of the respective Note and Security Agreements containing said Dragnet Clauses.

Moreover, the absence of the specific references to which were just alluded in the two preceding paragraphs is in contradistinction to the documentary treatment given by Allegheny in the Note and Security Agreements to the debtor's shares and deposits in his accounts with Allegheny. In particular, Allegheny makes specific reference to security interests in said shares and deposits in two places on the face of the April 1, 1997 Note and Security Agreement, *see supra* pp. 515–517, and in three places on the face of both the September 23, 1997 and February 24, 1998 Note and Security Agreements, *see supra* pp. 515–517, despite the fact that security interests in said shares and deposits are also (a) referred to in the inconspicuous language contained on the back of each of said Note and Security Agreements (sentence preceding each of the Cross–Collateralization Clauses), *see supra* pp. 516–517, and (b) taken by Allegheny via the three Dragnet Clauses. There is no explanation for the inconsistent documentary treatment afforded to the debtor's shares and deposits in his accounts with Allegheny on the one hand, and the 1997 Dodge and the 1997 Kawasaki on the other hand, other than that the parties (a) intended that the aforesaid shares and deposits would collateralize all four of the debtor's loans with Allegheny, (b) did not intend for the 1997 Dodge to collateralize any of said loans other than the April 1, 1997 Loan, and (c) did not intend for the 1997 Kawasaki to collateralize any of said loans other than the September 23, 1997 Loan.

11. The pre-printed language contained on the front of the September 23, 1997 and February 24, 1998 Note and Security Agreements, in the section entitled "Truth–In–Lending Disclosure," to the effect that "[c]ollateral securing other loans with the credit union *may* also secure this loan," is in contradistinction to the Cross–Collateralization Clauses found on the back of the same documents, wherein an indication is made that cross collateralization *will*, not *may*, occur. Thus, the aforesaid language on the front of the September 23, 1997 and February 24, 1998 Note and Security Agreements does not even serve to provide a general indication that (a) the 1997 Dodge *will* collateralize, *inter alia*, the September

23, 1997 and February 24, 1998 Loans, and (b) the 1997 Kawasaki *will* collateralize, *inter alia*, the February 24, 1998 Loan. In any event, the aforesaid language on the front of the September 23, 1997 and February 24, 1998 Note and Security Agreements is also general in nature instead of specific despite the fact that, as noted above, specific references could have been made therein to the two vehicles in question if Allegheny desired to cross collateralize as it now asserts. Therefore, said language does not serve to help Allegheny's cause regarding whether the April 1, 1997 and September 23, 1997 Dragnet Clauses satisfy the first part of the Four–Part Test.

**B.** *Whether the other indebtednesses allegedly covered by each of the security agreements containing the aforesaid dragnet clauses are of the same class as the debt referenced within each of said security agreements?*

The Court concludes that the April 1, 1997 and September 23, 1997 Dragnet Clauses fail this part of the Four–Part Test as well because the Court concludes that none of the four loans between Allegheny and the debtor can be considered to be in the same class with one another. The Court arrives at the preceding conclusion because each of the four loans between the parties are the result of separate loan transactions which are completely unrelated to each other, as evidenced by the fact that each loan (a) was consummated via, and memorialized pursuant to, a separate promissory note and security agreement, (b) is subject to a separate repayment schedule and financing rate, and (c) was obtained by the debtor to purchase discrete items of personal property.

The only common attribute or trait shared by each of the four loans in question that the Court can identify is that each loan was obtained by the debtor so that he could then make what can broadly be categorized as consumer purchases. The Court understands Allegheny to (a) contend that the sharing of this particular attribute or trait by each of the four loans in question suffices to place each of said loans in the same class with one another for purposes of the Four–Part Test, and (b) interpret holdings in the *Potomac Coal Co.* and *Winkelspecht* to support said contention by Allegheny. Unfortunately for Allegheny, the Court, as explained below, agrees neither with the preceding position by Allegheny nor with Allegheny's interpretation of pertinent holdings from the aforementioned case authorities.

■ As the *Winkelspecht* court noted, "*Potomac [Coal Co.]* held that a loan for business capitalization purposes would be related to another business loan, but not to a consumer loan." *Winkelspecht, supra,* at 6. However, this particular holding does not mean, and neither the *Winkelspecht* nor *Potomac Coal Co.* courts subsequently held, that all consumer loans of a debtor are *per se* related to each other such that they can be considered to be of the same class for purposes of the Four–Part Test. In fact, the *Potomac Coal Co.* court cites only the decision in *In re Grizaffi*, 23 B.R. 137 (Bankr.D.Colo.1982), as supportive of its holding that business loans and consumer loans are not related to, and thus not in the same class with, each other. *See Potomac Coal Co.,* 679 A.2d at 805. However, the *Grizaffi* court, after encountering not only business and consumer loans in general but also three separate consumer loans in particular, held that none of the loans of the debtor therein were significantly related to one another. *See Grizaffi,* 23 B.R. at 140. Moreover, the *Winkelspecht* court's conclusion that the consumer loans of the debtors therein were of the same class is predicated not only upon the mere fact that said loans were all decidedly consumer in nature, but also upon the fact that said extensions of credit were obtained pursuant to one particular loan document granting to the debtors therein essentially a revolving line of credit. *See Winkelspecht, supra,* at 6–7. This Court agrees with the *Winkelspecht* court that, if a debtor obtains several consumer loans pursuant to a common loan document granting to said debtor a revolving line of credit, then said loans are of the same class for purposes of the Four–Part Test. Unfortunately for Allegheny, each of the four loans between itself and the debtor were consummated pursuant to separate promissory notes and security agreements. As a consequence, this Court shall conclude that none of the four loans between the parties are sufficiently related to one another such that they can be considered to be of the same class for purposes of the Four–Part Test. Therefore, the April 1, 1997 and September 23, 1997

Dragnet Clauses also fail the second part of the Four–Part Test.

### C. Whether the other indebtednesses allegedly covered by each of the security agreements containing the aforesaid dragnet clauses were intended to be separately secured?

The Court concludes that each of the four loans between the parties were intended to be separately secured to the extent that said loans were intended to be secured at all, with the exception that, at least with respect to the latter three of said loans, the parties intended that the debtor's shares and deposits in his accounts with Allegheny would secure each of said three loans. The Court arrives at the preceding conclusion for several reasons.

First, with respect to the VISA Credit Card Account the relevant documents evidence that, with the possible exception of the debtor's shares and deposits in his accounts with Allegheny, the parties intended neither (a) for said indebtedness to be cross collateralized by security interests subsequently obtained in conjunction with future loans, nor (b) for said indebtedness to actually be secured in any fashion. The preceding conclusion follows because (a) Allegheny did not require, as a condition for the initial extension of credit to the debtor via the VISA Credit Card Account, that the debtor provide collateral therefor (other than perhaps the aforesaid account shares and deposits), see supra pp. 515–516, (b) Allegheny did not take a security interest in any property which purportedly operates to collateralize the VISA Credit Card Account (other than perhaps the aforesaid account shares and deposits) until approximately three years had passed from the opening of said account (i.e., until April 1, 1997, which date is when Allegheny took a security interest in the 1997 Dodge, which security interest purportedly secures, inter alia, the VISA Credit Card Account), (c) credit card loans are typically (i) unsecured, or (ii) if secured, only se-

cured by cash, as perhaps is the case herein, and (d) Allegheny's security interests in the 1997 Dodge and the 1997 Kawasaki were obtained by Allegheny via loan transactions with the debtor that were separate and completely unrelated to Allegheny's extension of credit via the VISA Credit Card Account.

Second, the Court infers from its prior finding, to wit that the three subsequent loans between the parties are the result of transactions that are separate and unrelated to one another, see supra pp. 524–525, that, with the exception of cross collateralization via the security interest in the aforesaid account shares and deposits, each of the three subsequent loans between Allegheny and the debtor were intended to be separately secured. The Court also concludes, at a minimum and even absent the preceding inference, that (a) the relevant loan documents do not preponderantly evidence that any of the loans between Allegheny and the debtor were intended to be cross collateralized (i.e., were not intended to be separately secured), with the exception of cross collateralization via the security interest in the aforesaid account shares and deposits, and (b) the introduction of testimonial evidence by Allegheny would not affect the preceding conclusion because the weight of any such testimony could not overcome the contrary inferences that must be drawn from the relevant documents. Because Allegheny, with respect to the third part of the Four–Part Test, bears the burden of preponderantly persuading the Court that the loans between the parties were not intended to be separately secured, see supra pp. 519–520, and since Allegheny has not so preponderantly persuaded the Court with respect to either the VISA Credit Card Account or the three subsequent loans between the parties, the Court must conclude that the loans between the parties were intended to be separately secured.

As a result of the above, the Court must conclude that the April 1, 1997 and Sep-

tember 23, 1997 Dragnet Clauses fail the third part of the Four–Part Test.

### D. Whether Allegheny relied on the April 1, 1997 and September 23, 1997 Dragnet Clauses in making further loans?

Allegheny, of course, could not possibly have relied upon the April 1, 1997 Dragnet Clause when it extended credit to the debtor via the VISA Credit Card Account in 1994. *See Shapiro,* 109 B.R. at 134 ("Such reliance could never arise in a situation where the obligation sought to be swept within the dragnet is a past indebtedness as opposed to a future indebtedness"). Likewise, Allegheny could not possibly have relied upon the September 23, 1997 Dragnet Clause when it extended credit to the debtor via either (a) the VISA Credit Card Account in 1994, or (b) the April 1, 1997 Loan. Therefore, the outcome of the application of this part of the Four–Part Test to the two dragnet clauses in question cannot possibly aid Allegheny in its attempt to demonstrate that (a) the VISA Credit Card Account is so related to either the April 1, 1997 or the September 23, 1997 Loans that the consent of the debtor to the inclusion of said account under said dragnet clauses may be inferred, and (b) the April 1, 1997 Loan is so related to the September 23, 1997 Loan that the consent of the debtor to the inclusion of the former loan under the September 23, 1997 Dragnet Clause may be inferred.

With respect to whether Allegheny relied on the April 1, 1997 and September 23, 1997 Dragnet Clauses in making subsequent loans to the debtor, the Court infers from its prior finding, to wit that the last three loans between the parties are the result of transactions that are separate and unrelated to one another, *see supra* pp. 524–525, that said reliance by Allegheny did not occur. The Court also concludes, at a minimum and even absent the preceding inference, that (a) the relevant loan documents do not preponderantly evidence that the reliance by Allegheny just discussed ever occurred, and (b) the introduction of testimonial evidence by Allegheny would not affect the preceding conclusion because the weight of any such testimony could not overcome the contrary inferences that must be drawn from the relevant documents. Because Allegheny, with respect to the fourth part of the Four–Part Test, bears the burden of preponderantly persuading the Court that the aforesaid reliance occurred, *see supra* pp. 519–520, and since Allegheny has not so preponderantly persuaded the Court, the Court must conclude that such reliance on Allegheny's part never materialized.

As a result of the above, the Court must conclude that the April 1, 1997 and September 23, 1997 Dragnet Clauses fail the fourth part of the Four–Part Test.

### CONCLUSION

For the reasons expressed above, the Court concludes that the April 1, 1997 and September 23, 1997 Dragnet Clauses satisfy neither the Four–Part Test nor, consequently, the "relatedness rule." Thus, the Court is constrained to conclude that said Dragnet Clauses are not enforceable. As a consequence of the preceding decision (a) the debtor possesses equity in the 1997 Dodge and the 1997 Kawasaki, (b) Allegheny is thus not entitled to the stay relief that it seeks via § 362(d)(2), (c) the February 24, 1998 Loan and the VISA Credit Card Account are not secured by the 1997 Dodge and/or the 1997 Kawasaki, and (d) the debtor is entitled to a return of, and Allegheny must reimburse the debtor for, all post-petition wage deductions exacted by Allegheny in payment of the February 24, 1998 Loan given that the debtor contractually did not need to make said payments in order to retain either of the aforesaid vehicles post-petition. Therefore, Allegheny's motion for relief from stay pursuant to § 362(d)(2) is **DENIED WITH PREJUDICE** and Allegheny is **ORDERED TO RETURN** to the debtor

all post-petition payments made by the debtor on the February 24, 1998 Loan.