Devlin, Administrator, Appellant, v. Piechoski.

640

Argued April 17, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

Appeal, No. 152, ▮

▮ reargument refused October 2, 1953.

*George W. Alexander, Jr.,* with him *D. T. Spagnoletti* and *Walter E. Alessandroni,* for appellant.

*Thomas Raeburn White, Jr.,* with him *Thomas Raeburn White* and *White, Williams & Scott,* for appellee.

OPINION BY MR. JUSTICE JONES, June 26, 1953:

The plaintiff, James Devlin, administrator of the estate of Rosella Devlin, deceased, sued the defendant, Joseph Piechoski, in trespass for damages on two causes of action, viz., wrongful death and survival, growing out of the death of Rosella in the crash of an airplane which Piechoski was piloting by leave of the owner.

Piechoski having failed to appear, the prothonotary, upon praecipe, entered judgment for the plaintiff under Rule 1047 R.C.P. for want of an appearance and answer by the defendant. The quantum of the damages was later fixed by the court after a hearing in the sum of $21,474.16. The plaintiff issued an attachment-execution on the judgment, summoning as garnishee Indemnity Insurance Company of North America, the insurer in a policy issued to the owner covering operation of the airplane. The garnishee pleaded nulla bona, claiming that the policy did not cover the accident because it was not to apply "while any aircraft of the assured is operated in violation of Federal regulations for civil aviation applicable, *inter alia,* to minimum safe altitudes, and the accident in this case was caused by low flying in violation of said regulations as set forth in the complaint of the plaintiff, upon the basis of which judgment in this case was obtained." One of the specific averments of negligence contained in the plaintiff's complaint was that Piechoski was flying the plane at the time of the accident at an altitude of less than 500 feet in violation of the regulations.

The issues raised by the garnishee's plea were heard by the court below and a jury which returned a verdict for the plaintiff on the basis of three special findings. On the garnishee's motion, the court below in an opinion by the learned trial judge awarded a new trial on the ground that "the finding of the jury that the accident was not caused by the failure of the defendant to observe the minimum safe altitude regulations was against the weight of the evidence." From the order granting the new trial, the plaintiff has appealed. In the light of the pleadings and evidence, the appellant's burden in this court is a particularly heavy one. It is incumbent upon him to show that the ac-

tion of the court below constituted, in the circumstances, a palpable abuse of discretion: *Bellettiere v. Philadelphia*, 367 Pa. 638, 642, 81 A. 2d 857.

On the issue of altitude, six disinterested eyewitnesses testified that the airplane had been flying immediately prior to the accident at a height of from 50 to 500 feet. The *only* person who testified to the contrary was Piechoski who, having absented himself from the trial of the negligence action, appeared as a witness for the plaintiff at the trial of the garnishment. He was, however, directly and seriously impeached. A police officer testified that Piechoski had told him shortly after the accident that he had been "fooling around" at about 500 feet which Piechoski denied having said. It is of course the rule, as we said in *Carroll v. Pittsburgh*, 368 Pa. 436, 445, 84 A. 2d 505, that, —"A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion .... Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party ...." But, here, there is evidence in the form of sworn averments in the plaintiff's complaint in the trespass action that Piechoski was flying below a 500-foot altitude at the time of and immediately preceding the accident. In a proceeding on an execution for the satisfaction of his judgment, the plaintiff is not at liberty to deny what he had affirmed in order to obtain the judgment: *Builders Supply Company v. McCabe*, 366 Pa. 322, 329, 77 A. 2d 368; see also *Commonwealth v. Monongahela Bridge Company*, 216 Pa. 108, 115-116, 64 A. 909; and Wigmore on Evidence, Vol. IV, Third Ed., §1064 (2), pp. 45-46. Nor is there any merit in the plaintiff's contention that he is not bound by his pleadings because

the judgment was taken by default. "So long as a judgment stands unreversed and unappealed from it may not be questioned in any other case. And the circumstance that there was no legal contest in reaching the judgment does not impair its effect. The modern decisions in England and in this country are at one on this point": *Stradley v. Bath Portland Cement Company*, 228 Pa. 108, 113, 77 A. 242; see also *Exler v. Wickes Brothers*, 263 Pa. 150, 154, 106 A. 233. Since the foregoing is true as to the effect of a judgment in a subsequent proceeding, it is, *a fortiori*, applicable as to the conclusive effect of a judgment in the proceeding in which it was entered. The only witness favorable to the plaintiff on the issue of the airplane's operational altitude prior to the accident was thus patently self-impeached.

We cannot, therefore, justly say that the learned court below was guilty of a palpable abuse of discretion in awarding a new trial on the ground that the cognate special finding, whereon, inter alia, the verdict for the plaintiff was based, was against the weight of the evidence.

It is unnecessary for us to consider or discuss the question raised by the plaintiff as to whether Endorsement No. 2 on the insurance policy had been effectuated at the time of the delivery of the policy by countersignature of an authorized agent as required by the endorsement. The executed policy, which was in the possession of the insured, could not be located prior to the submission of the case to the jury and therefore did not get into evidence at the trial. It was found, however, before the jury had rendered its verdict and both the trial judge and counsel were at once so notified. But, plainly enough, there was nothing that could be done in the circumstances with reference to the evident probative value of the policy. It obviously did not

qualify as after-discovered evidence within the legal signification of that term (*McDermott v. Marlow*, 336 Pa. 337, 9 A. 2d 420) and the learned court below properly rejected it as a ground for the granting of a new trial. The appellant, therefore, has nothing to complain of on that score. As the case necessarily goes back for a retrial, it is not inappropriate to point out, in view of the plaintiff's former contention on the basis of the nonconformed specimen policy supplied by the garnishee, that the burden of proving the policy and its terms was at all times upon the plaintiff: see *Hollander v. Kressman*, 143 Pa. Superior Ct. 32, 35, 17 A. 2d 669.

Order affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I see no reason for a new trial in this case. The tragic accident which brought the lawsuit into being occurred on August 28, 1949. The Indemnity Insurance Company of North America, which had insured the owner of the plane for aircraft liability, was notified of the accident two days later, August 30, 1949. When suit was filed by the administrator of the estate of Rosella Devlin against Joseph Piechoski, who, as lessee of the plane, was entitled to protection under the policy, the insurance company received a copy of the Complaint in Trespass. Although it knew that it was directly involved because of the insurance coverage, it displayed no interest in the case and allowed judgment to be obtained for want of appearance on the part of Piechoski. It equally ignored the proceedings for the assessment of damages. When garnishment proceedings were begun by the plaintiff, the insurance company finally officially came into the picture and denied liability, contending that at the time of the ac-

cident, Joseph Piechoski was flying at an altitude less than 1,000 feet, thus violating Civil Air regulations promulgated by the Civil Aeronautics Board.

On this factual issue, then, the case came on for trial before Judge MAWHINNEY and a jury. The jury, under adequate and clear instructions, found *specifically* that the accident did *not* occur "during a violation of the regulations of the Civil Aeronautics Board applicable to minimum safe altitude."

That was the issue, and the jury gave its answer, and returned a verdict for the plaintiff. Why must the case be retried?

In his Opinion granting the new trial, the learned Trial Judge said "that the finding of the jury that the accident was not caused by the failure of the defendant to observe the minimum safe altitude regulations was against the weight of the evidence." I believe that in this conclusion the learned Judge misapprehended the evidence. The pilot testified: "We took off and we headed into the direction of her neighborhood, and as we flew, naturally you climb it, and I stood at the height of 1300 feet. As I arrived around the vicinity of the accident, I made a left turn. As I made this turn, I went into a spin. When I was making this— while I was in this spin, your natural thing is to lower the motor as much as you can so you don't fall as fast. I did that, and while I was pulling out the motor went dead. And meantime I was looking, *trying to find a place, either to try and bring the plane up or to try and land it*. And after that the next thing I remember I was in the hospital."[1]

Not one of the six witnesses *contradicts* this statement. It is true that one witness saw the airplane at an altitude of 450 feet, another at 400 feet, another

---

[1] Italics throughout, mine.

at 150 feet, one at the height of a three-story house, another at the height of 50 feet, and finally one at 35 feet. There is nothing extraordinary about that. The airplane was falling! Naturally it would be getting closer to the ground all the time. Intentionally or unintentionally, that's the way every airplane finally completes its flight. Even counsel for the garnishee, in cross-examining the pilot, had to admit that the plane was coming down to the ground: "Q. You were *falling* pretty much straight down; is that right? A. Well, sort of an angle. Q. Sort of an angle? *And pretty much down towards the ground?* A. Naturally."

It will be noted from the above that the plane was descending at an angle. The pilot was trying to find a spot where to land. He explained: "All I was trying to do was find out how I could find a place to land." He was coming down because he could not remain upstairs.

The evidence of most of the six witnesses who testified about the plane's closeness to the earth is valueless when it comes to adding up the "weight of the evidence" on the specific issue of violation of the Aeronautics code. Certainly no one will seriously argue, on the basis of Marie Grace's testimony, that Piechoski was purposely operating his plane horizontally on a level of *35 feet*! Or, on the basis of Elizabeth Smith's testimony, that he intentionally flew horizontally at a level of *50 feet*! The testimony of Barbara Ann Thieroff, who was only eight years of age when the accident occurred, reveals rather clearly what the six witnesses meant when they spoke about the airplane flying at a low altitude. Barbara testified: "It was in the sky, *the same level as our house,* and then I— because *things were falling on the ground,* so I looked again and I seen it, so I ran up the street, and I watched it *come all the way down.*" Here are three witnesses

who obviously saw the plane only in its death throes as it was hurtling to the ground out of control. How can their testimony in strict English be considered as disputing what Piechoski said, namely, that he started to fall from the height of 1300 feet? The testimony of Richard J. Rentz confirms Piechoski: "Q. What if anything did you see about an airplane that day? A. Well, at that time I noticed people looking up into the sky, and I just happened to look up too and I seen a plane coming out of the northwest, and it seemed to be *getting lower all the time.*"

When the airplane was at the 150 foot height, where Joseph Francis Conlan saw it, it could only have been *falling* because no one in his right mind would fly a plane over a congested area in the city of Philadelphia at 150 feet, and no evidence was introduced to show that Piechoski was insane or that he was trying to kill his girl companion and himself too. It cannot be earnestly contended that Piechoski was flying between two school buildings just for the fun of it. The evidence is clear as the sun in the sky that he had no other choice!

The story of this airplane crash is but another page in the book of aviation's brave but yet unsuccessful attempt to permanently conquer the air. Newspaper headlines only too frequently proclaim the sad tidings of airliners that crash, with heavy toll of life, and without seeming explanation, soon after the takeoff. That is apparently what happened to Piechoski. Trouble hit him shortly after he achieved altitude: "Q. In other words, after you got your altitude you flew southwest and started to make a right-hand turn or left? A. Right-hand. Q. Right-hand turn. And then you went into a spin, right at that time? A. Right."

The testimony of one or two witnesses might seem, taken isolatedly, to convey the impression that, in the

momentary glimpse they caught of the descending plane, it was in flight. But that is only because the plane still had some gliding capacity: "Q. How long after your motor failed did you crash? Was it right away or was it a little time? A. A matter of seconds. That's all I can tell you. Q. Did you fly any distance after your engine was dead? A. *I must have flown a little bit.* You got enough room to move,—if you have got air speed, you are going to move. I must have flew a little. You don't have to have the motor on to fly. *You can glide.*"

And it was while he was gliding and moving on accumulated air speed that he was seeking a clearing where he might land with safety to his plane, his passenger and those on the ground: "Q. Where were you trying to land your plane? You said you were looking for a place to land. Where did you try? A. Your only idea is, when that happens, is to try and find a place. If you can find it is another thing."

One witness, Foster Miller Schoch, on the ground, claimed to distinguish between a 350 foot altitude and a 300 foot altitude. It is barely possible that he saw the plane lift a little even after its visible descent because the pilot, as indicated, was seeking by gliding to maneuver into a safe landing.

I cannot agree with the majority opinion that the testimony of the pilot was seriously impeached because a police officer said that shortly after the accident the pilot told him he had been "fooling around" at 500 feet. Not only did Piechoski deny that he had made such a statement but a careful reading of Officer Dean's testimony will show that it is utterly destitute of probative value. After the crash, Rosella Devlin (who apparently was Piechoski's particular girl friend) and Piechoski were rushed to the hospital. The girl died practically immediately. Piechoski was given emer-

gency treatment and while he was lying on a bed in the Accident Ward still "dazed and shocked" (even according to the officer's testimony) only 20 minutes after the crash, Dean questioned him. Even if we assume that Dean correctly reports the conversation (although he took no notes) we must consider whether Piechoski was in sufficient possession of his faculties to be held responsible for whatever words babbled from his lips while the nightmare of the catastrophe was still upon him. He had crashed to the earth from the heavens, his girl friend sitting next to him had been killed, he had sustained serious injuries himself, he was in a hospital bed, and the last rites were being given to his companion when Dean arrived and sarcastically asked him if he had "learned to fly in a circus."

It was the responsibility of the jury to determine whom to believe: Dean or Piechoski, and by their verdict it was evident that they had little faith in Dean's credibility and refused to believe that in such an awesome atmosphere and in such a painful state—physical, mental and spiritual—Piechoski would speak about "fooling around".

The majority opinion quoted from *Carroll v. Pittsburgh,* 368 Pa. 436: "A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion . . . Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party." But it did not apply the wisdom of that decision to this case because, it said, "there is evidence in the form of sworn averments in the plaintiff's complaint in the trespass action that Piechoski was flying below a 500-foot altitude at the time of and immediately preceding

the accident." There are many reasons why this position is not tenable:

(1)   A statement in a Complaint is not per se evidence.

(2)   Piechoski was not a party to the Complaint and is not to be held to what is contained in it.

(3)   It is common knowledge that Complaints contain many averments of negligence, some superfluous and some contradictory to one another. It is not necessary that the plaintiff prove everyone of the averments. It is sufficient that he prove one item of negligence responsible for the accident.

(4)   In *Srednick v. Sylak,* 343 Pa. 486, we said: "The general rule is that admissions of fact in pleadings are admissible, but the pleader's conclusions of law are not admissions of facts in issue. Whether an allegation is of fact or law is determined by the context disclosing the circumstances and purpose of the allegation. In perhaps the broad sense, the statement that a party is liable to another is a statement of fact, but the same words are in general use as a statement of law, and when intended to be so used the statement may not be treated as an admission of fact." To aver violation of a law is a conclusion of law and therefore not admissible as an item of evidence.

(5)   In the original suit the issue was that of defendant's liability to the plaintiff for negligence; but in the garnishment proceedings the issue was whether the insurance policy covered the risk in the particular circumstances. Thus, any admission in the original complaint in trespass cannot conclusively bind the plaintiff in the garnishment proceedings.

(6)   The doctrine of estoppel by admission is applicable only if the fact essential to judgment is actually litigated and judicially adjudicated. But the fact in question was not litigated, because judgment was en-

tered in the plaintiff's favor because of want of an appearance or answer.

(7) The plaintiff is the administrator of the estate of the deceased Rosella Devlin and has no personal knowledge of the facts. Thus, any averment of fact cannot bind him: "We are of opinion that the averment of such an admission is insufficient as a pleading and of *no value as evidence,* for it is well settled that an admission made by an executor or administrator with respect to matters of which he has no first-hand knowledge, as for instance the existence of an indebtedness by the decedent in his lifetime, cannot be received in evidence." (*Compton v. Heilman,* 331 Pa. 545, 549.)

To allow the garnishee in this case another opportunity to prove what they were unable to prove in the first trial is, in my judgment, supererogatory. There was very little dispute, if any, as to the actual facts. The only dispute was as to the inferences to be drawn from the facts. It was uncontested that Piechoski was a trained pilot, that he had no reason to want to be careless since not only the life of his friend but his own was at stake, that something happened to the engine of the airplane, and that he crashed to the ground. The testimony of the six witnesses for the garnishee seems to have troubled the trial judge, but it didn't need to. There was only one issue. When these witnesses saw the airplane at the varying heights they testified to, was the airplane *flying* or *falling*? The jury decided that the aircraft was falling. And with that ascertainment of fact the plaintiff was entitled to recover. The Judge put this very issue squarely to the jury: "If a person for some reason has a misfortune in the air, and it is uncontrollable, and because of the lack of control that he has over the mechanism of the aircraft it goes below a thousand feet, then, in that

event, I will say to you as a matter of law that *that is not a violation.* A violation is one concerning which one would have knowledge and continue to do it in the face of the regulations."

The Judge put this issue squarely to them again in affirmance of the plaintiff's Point No. 17, which read: ". . . if the jury finds that Joseph Piechoski was operating the aircraft in violation of Federal regulations for civil aviation applicable to minimum safe distances, but that *such violation was due to circumstances beyond his control,* their verdict must be *for the plaintiff,* James Devlin, administrator of the estate of Rosella Devlin, deceased."

The same issue was submitted to the jury through the affirmance of Defendant's Point No. 21: "If you find that the aircraft in which Rosella Devlin was riding when she received the injuries which caused her death was operated with the consent and knowledge of the defendant, Joseph Piechoski, *below an altitude of 1000 feet* above the highest object in the immediate vicinity of the crash immediately prior to the crash, your verdict must be *in favor of the garnishee.*"

What more can a jury do in another trial? It can only decide whether Piechoski purposely navigated below the 1,000 foot level or whether he got into that stratum of peril for reasons entirely beyond his control—and a jury, duly selected and duly instructed has definitively decided that issue.

The jury also passed on the matter of the endorsement of the policy which was put to them as a question, through the affirmance of the Plaintiff's Point No. 16, as follows: ". . . even if the jury believes that the endorsement to clause (e) under 'Exclusions' was in effect on August 28, 1949, if they find that Joseph Piechoski was not violating the Federal regulations for civil aviation applicable to minimum safe altitudes,

their verdict must be for the plaintiff, James Devlin, administrator of the estate of Rosella Devlin, deceased."

A reading of the record shows that this case was vigorously and most competently tried by very able and resourceful counsel. The trial was presided over by a very able and experienced judge. No reversible error occurred throughout the entire length of the long proceedings. I would let the conscientious and just verdict—which was the fruit of all these endeavors— remain as it is.