In re Charles T. **GIBSON**, Sr., Debtor.

No. 99–34002DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

June 20, 2000.

Joseph L. Gibson, Jr., Riverdale, MD, for Debtor.

Warren Wolf, Cureton, Caplan & Clark, P.C., Mount Laurel, NJ, for C.D.B. Finance Corp.

Pamela Karr Harrison, Special Assistant, United States Attorney, Philadelphia, PA, for Internal Revenue Service.

Drew E. Aldinger, Philadelphia, PA, for First Union National Bank.

Edward Sparkman, Philadelphia, PA, trustee.

Frederic Baker, Philadelphia, PA, Assistant U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant decision resolves the merits of objections ("the Objections") of CHARLES T. GIBSON, SR. ("the Debtor") to the amended proof of claim ("the Claim") filed by of C.D.B. FINANCE CORPORATION ("CDB"). We find that, since a Pennsylvania state court entered judgment in favor of CDB in the amount of $143,848.54, we are bound by that sum in our calculation of the total Claim. However, we hold that only post-petition interest at the Pennsylvania legal interest rate of six (6%) percent per annum from the date of judgment through the projected date of confirmation of the plan, which we estimate to be July 20, 2000, can be added to the Claim.

Further, we find that the "dragnet clauses" in the instant business loan documents fail to satisfy "the relatedness rule" for enforcement of same. As a result, we hold that these clauses are unenforceable and render the security interests allegedly arising from three of the four loans at

issue unenforceable. After giving the Debtor credit for post-petition payments, the secured claim of CDB is properly fixed at $46,800.00. Since it appears within his financial reach to do so, we will give the Debtor an opportunity to amend his present plan to liquidate this sum, plus pay deferred interest, the Trustee's commission, and any other secured and priority claims which must be liquidated in the plan.

## B. *FACTUAL AND PROCEDURAL HISTORY*

On February 20, 1989, the Debtor and CDB entered into their first loan transaction ("the First Loan"). Pursuant to the terms of the First Loan, the Debtor received an amount of $21,270 and agreed to repay $37,200 at an interest rate of 24.656 percent in 60 monthly installments of $620 over a five-year period. As security for this loan, the Debtor; his brother, JOSEPH L. GIBSON, JR., an attorney practicing in Maryland who represents the Debtor in this case ("the Brother"); and his sister, DARLENE GIBSON STEWART ("the Sister"), executed two mortgages and a promissory note in favor of CDB which provided for a lien on two different properties. The first property was and is the Debtor's principal residence at 3903 Baring Street, Philadelphia, Pennsylvania 19104 ("the Baring Property"). The second property consisted of another residence owned by the Debtor at 518 North Wanamaker Street, Philadelphia, Pennsylvania 19131 ("the Wanamaker Property").

Shortly thereafter, CDB approached the Debtor and offered him two additional loans (respectively, "the Second Loan" and "the Third Loan"). The Second Loan apparently provided the Debtor with a total dollar amount of $45,360 [1] payable at an interest rate of 15.006 percent in 180 monthly installments of $252 over a fifteen-year period and allowed him to pur-

chase a property previously owned by CDB, located at 5330 Addison Street, Philadelphia, Pennsylvania 19143 ("the Addison Property"). The Third Loan provided the Debtor with a total amount of $17,640, also at 15.006 percent, payable in 180 monthly installments of $98 over a fifteen-year period to cover necessary renovations and repairs on the Addison Property. In connection with these transactions, the Debtor signed two additional mortgages and notes in favor of CDB which, *inter alia,* provided for liens on the Addison Property.

On May 23, 1990, CDB approached the Debtor again and offered him a final loan ("the Fourth Loan"). The Fourth Loan provided the Debtor with a total amount of $57,960 payable at an interest rate of 18 percent in 180 monthly installments of $322 over a fifteen-year period and the proceeds were used to purchase another CDB-owned property located at 4832 Ogden Street, in Philadelphia, Pennsylvania 19139 ("the Ogden Property"). In the Fourth Loan, the Debtor did not receive any monies for the transaction at hand, but simply received the Ogden Property in question after executing a mortgage and a promissory note providing for a lien on that property.

The Mortgages executed in all of the four transactions at issue contained cross-collateralization or "dragnet" clauses. The entire text of the identical clauses in all of the Mortgages in question reads as follows:

(1) The Note secured hereby shall evidence and this Mortgage shall cover and be security for any future loans or advances that may be made by Mortgagee to Mortgagor at any time or times hereafter and intended by Mortgagor and Mortgagee to be so evidences [sic] and secured, and such loans and advances shall be added to the principal debt. . . .

---

**1.** *But see* page 649 & n. 2 *infra,* where we note that this loan appears on CDB's records

as having a beginning balance of only $7000.

In like manner, the Promissory Notes provided in connection with these transactions all contain the following language:

> This note shall evidence and the Mortgage given to secure its payment shall cover and be security for any future loans or advances that may be made to or on behalf of the Undersigned and the then holder to be so evidenced and secured, as well as any sums paid by any holder hereof pursuant to the terms of said Mortgage, and any such loans, advances or payments shall be added to and shall bear interest at the same rate as the principal debt. . . .

Thus, the Mortgages and Notes executed with the First Loan purported to cross-collateralize the monies provided in the Second, Third, and Fourth Loans. Likewise, the Mortgages and Notes executed with the Second, Third, and Fourth Loans contained similar provisions. As a result, the four Loans at issue were all purportedly cross-collateralized by all four properties in question.

The Debtor fell behind on his monthly payment schedules on or about 1993. Nevertheless, CDB did not dispatch any default and/or foreclosure notices to the Debtor until November 6, 1998, five years after he defaulted on his monthly payment schedules for the first time.

It appears that the principal balances due on the Loans were reduced to as low as the following amounts as of the following respective dates: (1) First Loan—January 31, 1994—$9,939.40; (2) Second Loan—October 11, 1991—$6,911.35;[2] (3) Third Loan—October 11, 1991—$17,-772.03; and the Fourth Loan was only $27,500 at its inception. The total balances were therefore at one time in total amounts as low as about $63,000. However, the accrual of high interest compounded on a monthly basis brought the balances up to the following amounts, according to CDB, as of the end of 1999: First Loan—$30,405.03: Second Loan—$12,752.35; Third Loan—$40,910.24; and Fourth Loan, $100,204.10, for a total of over $183,000.

On March 19, 1999, CDB filed three foreclosure actions against the Debtor in the Court of Common Pleas of Philadelphia County ("the CCP"). The Debtor failed to respond and default judgments in all three actions, totaling $143,848.54, were entered against him in May, 1999, as illustrated in TABLE 1 below:

TABLE 1 .
DEFAULT JUDGMENTS ENTERED AGAINST THE DEBTOR IN STATE COURT

| | TRANSACTION | DATE OF JUDGMENT | DOLLAR AMOUNT AWARDED |
|---|---|---|---|
| 1. | First Loan Transaction (Baring & Wanamaker) | 05/24/99 | $ 46,862.21 |
| 2. | Second and Third Loans (Addison) | 05/23/99 | $ 52,094.35 |
| 3. | Fourth Loan (Ogden) | 05/23/99 | $ 44,891.98 |
| | TOTAL DOLLAR AMOUNT AWARDED | | $ 143,848.54 |

Three months later, on November 8, 1999, the Debtor filed the instant individual Chapter 13 bankruptcy case. On December 9, 1999, CDB filed the Claim, reciting $211,758.83 as the principal amount of its indebtedness, although CDB now agrees that the figure should be no greater than $169,011.74.

On February 8, 2000, CDB filed a Motion for Dismissal, or, Alternatively, for

---

**2.** This Loan is reflected in CDB's records as having a $7000 beginning balance. The record contains no explanation of why this sum appears when the face amounts of the Mortgage and accompanying Note are $45,360.

Relief from the Automatic Stay ("the Motion"), to which the Debtor filed an Answer. On February 22, 2000, the Debtor filed the Objections to the Claim before us. A hearing on the Motion was scheduled on February 29, 2000, and continued by agreement to March 14, 2000.

A two-hour hearing on the Motion was conducted on the latter date. At the outset of the hearing, counsel for CDB advised us that the dismissal portion of the Motion would be withdrawn. Similarly, counsel for the Debtor advised us that he would not contest the Motion as to the Addison and Ogden Properties, thereby allowing CDB to enforce its rights as to those two properties.

The only witnesses at the hearing were David Bernstein, CDB's current president, and the Debtor himself. The testimony provided focused primarily on (1) the circumstances of the four Loans; (2) the CCP judgments obtained; (3) CDB's records of the balances due on the Loans; and (4) the feasibility of the Debtor's amended Chapter 13 plan, which presumably was aimed at the Debtor's continued retention of the Baring and Wanamaker Properties. At the close of the hearing, we entered an Order which at that time denied relief as to the Baring and Wanamaker properties pending a hearing on the Objections, but relisted the Motion for reconsideration on April 4, 2000.

The confirmation hearing in the Debtor's case was first scheduled on April 13, 2000. The Objections were initially continued to that date, on which progress towards settlement was reported, resulting in a continuance of confirmation and the hearing on the Objections until May 11, 2000. The Standing Chapter 13 Trustee also filed, on April 18, 2000, a motion to dismiss this case for lack of payments and infeasibility of the Debtor's Chapter 13 plan. That plan called for payments of $800 monthly for 60 months, $683.33 monthly of which was allocated to CDB.

At the hearing on the Objections, testimony was adduced from the Debtor; An-

dre Dade, a law clerk in the Brother's law office; and Bernstein. At the close of the hearing, we entered an Order of May 12, 2000, inviting the parties to file simultaneous opening briefs in support of their respective positions on or before May 26, 2000, and reply briefs on or before June 2, 2000. Both parties filed their opening briefs on time. As to the reply briefs, the parties were granted an extension which they timely met by filing their respective submissions on June 5, 2000.

In its submissions, CDB maintained, initially, that the CCP default judgments awarded against the Debtor are binding on us in establishing the amount of the Claim. Nevertheless, it seeks to enhance these figures by adding alleged post-judgment expenditures for legal fees, foreclosure costs, and insurance, while allowing post-petition payment credits of $3303.00. In light of the Debtor's concession that certain real estate taxes and water and sewer bills against the Baring and Wanamaker Properties were delinquent, which CDB claimed exceeded $55,000 but our review of the Debtor's testimony indicated is $25,000 on all four properties, two of which he is not retaining, it argued that over $200,000 must be paid to effect a confirmable plan. Since this sum is over four times the total amount which the plan contemplated in payments, CDB argued that the Motion should be granted as to the Baring and Wanamaker Properties.

The Debtor, on the other hand, argued that CDB failed to properly credit and compute its payments and that it unfairly added significant unjustified charges. In his reply brief, the Debtor contended that service of the complaints in the CCP cases was defective and that therefore the judgments should be disregarded. Although the Debtor raised the issue summarily, neither party addressed at length the issue of whether the cross-collateralization or "dragnet" clauses in the loan documents were enforceable.

## C. DISCUSSION

1. *The CCP Judgments Are Conclusive as to All Issues Which They Address, Although the Doctrine of Merger Limits CDB's Claim to the Amounts of Those Judgments Plus Statutory Interest Through Confirmation.*

■ The first issues which must be addressed are (1) whether the CCP judgments awarded are binding on this court; and (2) whether the amounts enhancing the judgments claimed by CDB are allowable. Citing *In re Miloszar*, 238 B.R. 266 (D.N.J.1999), CDB maintained the default judgments entered by the CCP are binding. Next, it argued that, in addition to the $143,848.54 awarded in the CCP default judgments, see page 649 *supra*, the Debtor is liable as well for all legal fees, sheriff's foreclosure costs, forced-placement insurance costs, and interest accrued since the date that the judgments at issue were entered. According to CDB, once all post-petition payment activity is properly accounted for, the Debtor can be found to owe an additional $24,867.48, for a total sum of $169,011.74.

Even assuming *arguendo* the complete accuracy of CDB's approach, our own arithmetical calculations, as set forth on TABLE 2 below, reflects a corrected figure of $168,716.02:

TABLE 2
TOTAL DOLLAR AMOUNT OWED AS OF MARCH 14, 2000, AS CLAIMED BY CDB

| | TRANSACTION | DATE INCURRED | DOLLAR AMOUNT |
|---|---|---|---|
| 1. | State Court Judgments | 05/23/99 — 05/24/99 | $ 143,848.54 |
| 2. | Interest Accrued (Addison Property) | 05/23/99 — 03/14/00 | $ 6,893.37 |
| 3. | Interest Accrued (Ogden Property) | 05/23/99 — 03/14/00 | $ 7,158.92 |
| 4. | Interest Accrued (Baring and Wanamaker Properties) | 05/24/99 — 03/14/00 | $ 10,527.75 |
| 5. | Insurance Costs | 06/17/99 — 02/17/00 | $ 820.44 |
| 6. | Legal Fees | 05/27/99 — 02/02/00 | $ 770.00 |
| 7. | Sheriff's Foreclosure Costs | 11/15/99 | $ 2,000.00 |
| 8. | Debtor's Post–Petition Payment Activity | 12/23/99 — 02/29/00 | ($ 3,303.00) |
| | TOTAL DOLLAR AMOUNT | | $ 168,716.02 |

The Debtor countered by asserting that the Claim should be reduced significantly. To support this assertion, the Debtor pointed out that Bernstein conceded that CDB compounded the interest due on a monthly basis in making its calculations, which was allegedly not supported by the language of the Mortgages or the Notes. The Debtor claimed that all interest should be calculated at the Pennsylvania "legal" rate of interest of six (6%) percent, citing 41 P.S. § 202; and *Daset Mining Corporation v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 35–36, 473 A.2d 584, 595 (1984). In his reply brief, the Debtor also argued that neither the Debtor nor the Sister signed return receipts for certain of the CCP complaints, allegedly rendering the underlying judgments defective. He also claimed that CDB's improper calculation of interest amounted to such fraud as should prompt us to disregard the judgments.

■ We conclude, rather easily, that CDB's position with respect to the binding effect of CCP judgments on the determi-

nation of the Claim is generally correct. Bankruptcy courts do not have the power to reconsider and vacate state-court default judgments. *See Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 90 L.Ed. 970 (1946); *Raymark Industries, Inc. v. Lai,* 973 F.2d 1125, 1132 (3rd Cir.1992); *In re James,* 940 F.2d 46, 53 (3rd Cir.1991); *In re Brown,* 244 B.R. 62, 70 (Bankr. D.N.J.2000); *In re Raphael,* 238 B.R. 69, 83–84 (D.N.J.1999); *In re Crispino,* 160 B.R. 749, 756 (Bankr.D.N.J.1993); and *In re Garafano,* 99 B.R. 624, 630–31 (Bankr. E.D.Pa.1989).

■ In Pennsylvania, a judgment by default has *res judicata* effect and is therefore as conclusive as one rendered on a verdict after litigation insofar as a defaulting defendant is concerned. *See Zimmer v. Zimmer,* 457 Pa. 488, 491, 326 A.2d 318, 320 (1974); *Devlin v. Piechoski,* 374 Pa. 639, 643, 99 A.2d 346, 347 (1953); *Exler v. Wickes Bros.,* 263 Pa. 150, 154, 106 A. 233, 234 (1919); and *Stradley v. Bath Portland Cement Co.,* 228 Pa. 108, 117, 77 A. 242, 245 (1910). As a result, a default judgment is a final judgment that bars further litigation of the issues decided therein among the parties. *See Wexler v. Citibank,* 1994 WL 580191, at *5 (E.D.Pa. Oct.21, 1994); and *Fox v. Gabler,* 534 Pa. 185, 189, 626 A.2d 1141, 1143 (1993). In the face of these principles, the CCP default judgments entered against the Debtor must be considered final and conclusive of the issues addressed therein, namely the total amount of the Claim.

■ It is true that the validity of state court judgments can be attacked if the judgments [were] secured by fraud or entered by courts proven to have been without proper jurisdiction. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939) (bankruptcy court may rely on its equitable powers to disallow or subordinate a judgment procured by fraud); *Miners Savings Bank [of Pittston v. United States],* [110 F.Supp. 563,] at 568 [(M.D.Pa.1953)] (attacking a final judg-ment on the grounds of fraud or collusion is "an exception to the rule" that a final judgment may not be collaterally attacked); *Garafano, supra,* 99 B.R. at 630–31 ("[T]he bankruptcy court is not bound by a prior judgment which is rendered by a court lacking proper jurisdiction over the parties or subject matter, or where the judgment was obtained by collusion or fraud."); *In re Fazio,* 41 B.R. 865, 867 (Bankr.E.D.Pa.1984) ("Where a creditor's claim is predicated on a state court judgment, the claim may be attacked as invalid in the Bankruptcy Court on the grounds that the court rendering the judgment did not have jurisdiction over the parties or subject matter of the suit or that the judgment is a product of fraud, collusion or duress."); and *Howell v. Franke,* 393 Pa. 440, 442, 143 A.2d 10, 11 (1958) ("When the parties to an action contrive by the entry of judgment therein to defeat the rights of a third person in real estate, the judgment does not act as a bar against the claim of the person defrauded, and is therefore subject to collateral attack.").

*In re Kovalchick,* 175 B.R. 863, 872–73 (Bankr.E.D.Pa.1994).

The Debtor apparently sought to challenge the jurisdiction of the CCP to enter the judgments at issue by asserting that there had been improper service of the respective complaints. However, we note that the Debtor has never sought to invalidate the judgments on this or any other basis in the CCP. *Compare, id.* at 866–68 (debtors filed numerous pleadings attacking the state-court judgments). Therefore, the judgments stand valid of record.

■ More importantly, the Debtor made no record of the alleged service defects in the two hearings before us, instead seeking to assert these "facts" for the first time in his post-trial reply brief. As we recently observed in *In re Greenfield Dry Cleaning & Laundry, Inc.,* 249 B.R. 634, 641 (Bankr.E.D.Pa.2000), " 'evidence' not

admitted into a hearing or trial record cannot be considered."

As to the claim of "fraud" on the part of CDB in the entry of the judgments, the Debtor's claims rise no higher than an argument that CDB miscalculated its claim, as opposed to the sort of "extrinsic fraud" collateral to the issues, *e.g.*, falsely certifying service of a complaint, *see Kovalchick, supra,* 175 B.R. at 868 n. 1, which would possibly justify disregarding the CCP judgments. *See also Garafano, supra,* 99 B.R. at 631–32.

■ However, as to CDB's contentions that, in addition to the monies awarded in the CCP judgments, it is also entitled to all legal fees, foreclosure costs, forced insurance fees, and interests accrued since the date the judgments at issue were entered, we disagree. As noted in *Myers v. Borough of South Bethlehem,* 149 Pa. 85, 91, 24 A. 280, 281 (1892), under the law of Pennsylvania, "[a] judgment settles everything involved in the right to recover, not only all matters that were raised, but those which might have been raised." *See also Lance v. Mann,* 360 Pa. 26, 28, 60 A.2d 35, 36 (1948); *Commissioners of Sinking Fund v. City of Philadelphia,* 324 Pa. 129, 132, 188 A. 314, 316 (1936); and *Murray v. Weigle,* 118 Pa. 159, 164, 11 A. 781, 782 (1888). The "doctrine of merger of judgments," to which this principle is commonly referred, thus provides that the terms of a mortgage are merged into a foreclosure judgment and thereafter no longer provide the basis for determining or adding to the obligations of the mortgagor(s). *See In re Stendardo,* 991 F.2d 1089, 1095 (3rd Cir. 1993); *In re Johnson,* 140 B.R. 850, 854 (Bankr.E.D.Pa.1992); *In re Presque Isle Apartments, L.P.,* 112 B.R. 744, 747 (Bankr.W.D.Pa.1990); and *In re Herbert,* 86 B.R. 433, 436 (Bankr.E.D.Pa.1988), *aff'd sub nom. Herbert v. Federal Nat'l Mortgage Ass'n,* 102 B.R. 407 (E.D.Pa.1989).

■ The correct rule is that, once obligations are reduced to judgment, the only post-judgment enhancement permitted on that judgment is interest accruing thereon at the lawful rate. *See Stendardo, supra,* 991 F.2d at 1095; *Alten v. T.A.E.I., Inc.,* 1993 WL 308733, at *1 (E.D.Pa. Aug.13, 1993); *Presque Isle, supra,* 112 B.R. at 747; *In re Crane Automotive, Inc.,* 98 B.R. 233, 236 (Bankr.W.D.Pa.1989); *Herbert, supra,* 86 B.R. at 436; *Miller v. City of Reading,* 369 Pa. 471, 474, 87 A.2d 223, 225 (1952); and K. Heidt, *Interest Under Section 506(b) of the Bankruptcy Code: The Right, the Rate and the Relationship to Bankruptcy Policy,* 1991 UTAH L. REV. 361, 404–05 (1991).

■ The judgment rate in Pennsylvania is six (6%) percent. 41 P.S. § 202. *See In re Yorke,* 1996 WL 432422, at *2 (Bankr.E.D.Pa. July 30, 1996); *Johnson, supra,* 140 B.R. at 854; and *In re Rorie,* 98 B.R. 215, 219 (Bankr.E.D.Pa.1989). Therefore, after a judgment is entered, a debtor is no longer responsible for the contract rate of interest, nor for any other obligations claimed, such as post-judgment taxes, insurance, or legal fees, but only for additional interest at the six (6%) percent rate. *See In re Willett,* 196 B.R. 732, 733 (Bankr.W.D.Pa.1996); and *In re McKillips,* 81 B.R. 454, 456 (Bankr.N.D.Ill.1987). If the underlying obligation is over secured, as clearly appears to be the case here, this rate of accrual of interest continues until confirmation of the Debtor's plan. *See In re Blakeney,* 126 B.R. 449, 458 (Bankr.E.D.Pa.1991); and *In re Klein,* 106 B.R. 396, 402 n. 7 (Bankr.E.D.Pa.1989).

In light of these strictures, it is evident that the Debtor is correct in asserting that the Claim alleged by CDB must be reduced significantly. The Claim must therefore be measured by adding, to the amount of the judgments of $143,838.54, only interest at six (6%) percent between May 24, 1999, and July 20, 2000. This arithmetical computation, stated as follows, results in the addition of $10,003.95 in interest:

DAILY RATE OF INTEREST × JUDGMENT DATE/PLAN CONFIRMATION DATE × JUDGMENT AMOUNT = TOTAL INTEREST YIELD

.000164383 x 423 DAYS x $143,848.54 = $10,003.95

This computation downsizes CDB's total claim to $143,848.54 plus $10,003.95, or to $153,852.40.

From this figure, we must deduct the Debtor's agreed amount of post-petition payments directly to CDB, which amount to $3303. The allowed total Claim of CDB is therefore $150,549.49. We acknowledge a slight error to the advantage of CDB in this figure, because the interest is calculated on the entire balance, and the $3303 post-petition payments which have been made toward that balance would reduce the interest slightly. The Claim is therefore rounded off to $150,500.

2. *The "Dragnet" Clauses Appearing in the Mortgages and Notes Do Not Satisfy The "Relatedness Rule;" As a Result, the Cross–Collateralization Supported by the Said Dragnet Clauses Is Not Enforceable and Only the Amount of the Claim Based on the First Loan Is Determined to be Secured.*

Having determined the total amount of the Claim, we must next turn to the more significant issue of ascertaining the amount of the Claim which is secured. It is only after that determination that we can ascertain whether the Debtor could conceivably prepare a confirmable plan and whether the Motion should be granted as to the Baring and Wanamaker Properties.

We note at the outset that the classification of CDB's Claim as secured or unsecured is not a subject at issue in the entry of the CCP judgments, and therefore in no sense are those judgments conclusive on that point.

We further note that neither party comes to grips with the issue of how to determine the portion of CDB's which is validly classified as secured. The most significant legal issue relevant to this determination is the enforceability of the

cross-collateralization or "dragnet" clauses included in the Mortgages and Notes in issue, quoted at pages 648–49 *supra.*

The Debtor, in approaching the issue, argued that CDB's claim should be denied or reduced because it (1) failed to make adequate disclosures; (2) omitted advice to the Debtor of his alleged right to rescind the transactions at hand; and (3) neglected to explain the cross-collateralization provisions contained in each of the four loan transactions at issue.

■ We find no merit in the Debtor's argument regarding the lack of adequate disclosures and/or the failure to provide notices about the latter's right to rescind the transactions at hand. These arguments apparently invoke the federal Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"). However, the TILA does not apply to "credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. §§ 1603(1), 1605(a); and 12 C.F.R. § 226.3(a). *See also, Gombosi v. Carteret Mortgage Corp.*, 894 F.Supp. 176, 177 (E.D.Pa.1995); and *In re DiPietro*, 135 B.R. 773, 777 (Bankr. E.D.Pa.1992). Rather, the TILA's scope is limited to "consumer" credit transactions, which are defined as transactions in which "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h); and 12 C.F.R. § 226.2(p). In the instant case, the four transactions at issue were used solely for business purposes as evidenced by the Debtor's signed Affidavits of Business Loans. Accordingly, the TILA's disclosure requirements do not apply.

Thus, while we note the Debtor's disputes regarding the validity of the cross-collateralization provisions contained in the documents executed in the four transactions in question, their contentions fail to address the real issues at hand. That is to say, rather than discussing the applicable

law and the case law interpreting the enforceability of such clauses, the Debtor focuses solely on the fact that the Brother and the Sister, who were parties to the First Loan, did not join in the remaining three loans. While the difference in the parties to the Loans is one factor in the appropriate analysis, *see* page 657 *infra*, it is not the sole or even the principal matter to be considered.

■ The cross-collateralization provisions contained in the four transactions under scrutiny are commonly referred to as "dragnet clauses." This type of clause purports to allow a lender to secure future advances with previously-pledged collateral. *See Potomac Coal Co. v. $81,961.13 in the Hands of an Escrow Agent,* 451 Pa.Super. 289, 679 A.2d 800 (1996). *Cf.* K. Anderson, *New Jersey Commercial Loan Opinion Letters: The Remedies Opinion, Asset–Based Secured Transactions Opinions & Related Exceptions, Qualifications & Assumptions,* 25 SETON HALL L. REV. 141, 157 (1994). As noted by in *Potomac, supra,* 451 Pa.Super. at 297, 679 A.2d at 803,

> [i]n the law relating to real estate mortgages, dragnet clauses are clauses included in mortgages whereby creditors attempt to secure debt unrelated to the original mortgage indebtedness. In the real estate area, these clauses are widely disfavored since they cloud title. *E.g., In re Shapiro,* 109 B.R. 127 (Bankr. E.D.Pa.1990) . . . .

■ In Pennsylvania, as in most other states, dragnet clauses are disfavored, but are recognized as valid and enforceable if the advances provided are related to the purposes of the original loan agreement. *In re Winkelspecht,* 1998 Bankr.LEXIS 1921, at *5 (Bankr.M.D.Pa. Apr. 13, 1998). *See also Marine Nat'l Bank v. Airco, Inc.,* 389 F.Supp. 231, 233–34 (W.D.Pa.1975); *In re Fassinger,* 246 B.R. 513, 520–22 (Bankr. W.D.Pa.2000); *In re Lewis,* 212 B.R. 827, 828–30 (Bankr.E.D.Va.1997); *In re Cara Corp.,* 148 B.R. 779, 781–82 (Bankr. E.D.Pa.1992); *Shapiro, supra,* 109 B.R. at

132–35; *In re Swanson,* 104 B.R. 1, 3–5 (Bankr.C.D.Ill.1989); *In re Bates,* 35 B.R. 475, 477–78 (Bankr.M.D.Tenn.1983); and *In re Eshleman,* 1972 WL 20838, at *1 (Bankr.E.D.Pa. Apr.3, 1972).

It was following the enactment of the UCC that the "relatedness rule" was developed to reflect the disfavor with which dragnet clauses were viewed. *Potomac, supra,* 451 Pa.Super. at 297, 679 A.2d at 804. In *Kitmitto v. First Pennsylvania Bank, N.A.,* 518 F.Supp. 297, 300–01 (E.D.Pa.1981), the court thusly comprehensively examined the origin of the relatedness rule as well as the countervailing case law:

> [The relatedness rule] serves to limit application of a future advance clause to those advances which are of the same class as the primary transaction. *See, e.g., Marine National Bank v. Airco, Inc.,* 389 F.Supp. 231, 234 (W.D.Pa. 1975); *In re Eshleman,* 10 U.C.C. Rep. 750, 752, 1972 WL 20838 (Bankr.E.D.Pa. 1972); *Community Bank v. Jones,* 278 Or. 647, 566 P.2d 470, 482 (1977).

The relatedness rule developed prior to the enactment of the Uniform Commercial Code and was a reflection of the disfavor with which courts viewed future advance or dragnet clauses in security agreements. *See* 12A Pa.Stat.Ann. § 9–204(5) (Purdon 1970) (official comment) (repealed 1979), 2 G. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY, § 3513, at 920–21 (1965); Justice, *Secured Transactions— What Floats Can Be Sunk,* 24 Vill. L.Rev. 867, 899 (1979). Upon the enactment of the Code, with its express validation of future advance arrangements which were covered by the agreement, the question arose as to whether the relatedness rule survived. Professor Gilmore, who was one of the principal drafters of Article 9, was of the opinion that it did. He wrote:

> "However, 'covered by the security agreement' is to be read, § 9–204(5)

should not be taken to overrule the so called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful devise can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangements claims against the Debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the courts have regularly curbed such abuses: no matter how the clause is drafted, the future advances to be covered must 'be of the same class as the primary obligation ... and so related to it that the consent of the Debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness', vague but useful, should be applied to § 9–204(5)."

2 GILMORE, *supra* at 932.

Adhering to this view, a number of courts have held that the relatedness rule applies to a future advance security agreement under the Code. *See* [,] *e.g., Marine National Bank v. Airco, Inc.,* 389 F.Supp. 231, 234 (W.D.Pa.1975); *National Bank of Arkansas v. [Blankenship],* 177 F.Supp. 667 (E.D.Ark.1959), *aff'd sub nom. National Bank of Eastern Arkansas v. General Mills, Inc.,* 283 F.2d 574 (8th Cir.1960); *Community Bank v. Jones,* 278 Or. 647, 566 P.2d 470 (1977); *John Miller Supply Co. v. Western State Bank,* 55 Wis.2d 385, 199 N.W.2d 161, 165 (1972). Other courts, however, have applied the parol evidence rule and have held that unambiguous future advance clauses cover all future advances. *See, e.g., In re Riss Tanning Corp.,* 468 F.2d 1211, 1213 (2d Cir.1972) (applying New York law); *In re Public Leasing Corporation,* 488 F.2d 1369, 1377–1378 (10th Cir.1973) (applying Oklahoma law).

*See also In re Sunshine Books, Ltd.,* 41 B.R. 712, 714 (Bankr.E.D.Pa.1984); and *Potomac, supra,* 451 Pa.Super. at 297–99, 679 A.2d at 804.

 In *Shapiro, supra,* 109 B.R. at 134, applying New Jersey law, we developed the following four tests to be applied in application of the relatedness rule:

(1) Whether the other indebtedness allegedly covered by the mortgage containing said dragnet clause are specifically intentional [sic-word should have been "expressed"] therein;

(2) Whether the other indebtednesses allegedly covered are "of the same class" as the debt referenced in the mortgage;

(3) Whether the other indebtednesses were intended to be separately secured; and

(4) Whether the mortgagee relied on the clause in making further loans.

*See also Fassinger, supra,* 246 B.R. at 521–22; *Winkelspecht, supra,* 1998 Bankr.LEXIS 1921, at *6; *Cara Corp., supra,* 148 B.R. at 782; and Annot., *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status,* 3 A.L.R.4th 690, 695–98, 716, 1981 WL 167385 (1981). By applying this four-pronged instant test to the issues at bar, we find that the dragnet clauses provided in the documents memorializing each one of the four Loans under scrutiny come up short on all prongs of this test.

In making this analysis, our principal focus is upon whether the documents executed in connection with the First Loan can support the extension of a security interest on the Baring and Wanamaker Properties, which are the only properties retained by the Debtor, to the balances due on the Second, Third, and Fourth Loans. There is no question that the Baring and Wanamaker Properties secure the First Loan. The significant issue is whether they also secure the subsequent loans.

If they do not, then the portions of CDB's Claim relating to the Second, Third, and Fourth Loans are properly classified as unsecured.

Applying the first of the four tests, we begin by observing that there is no specific reference to the other indebtednesses in any of the mortgage or loan documents, including the First Loan documents. Obviously, since the other indebtednesses came after the First Loan, no references could have been made there. However, we observe that no references to the earlier loans are made in either the Second, Third, or Fourth Loan documents.

Secondly, except for the Second and Third Loans, which both related to the Addison Property, none of the Loans constituted loans "of the same class" or having the same specific or general purposes as the others. The purpose of the First Loan was not made clear in the record. However, the purposes of the other loans were. The sole purpose of the Second and Third Loans was to purchase and repair the Addison Property in order to render it an income-producing parcel of real estate. The sole purpose of the Fourth Loan was to allow the Debtor to purchase the Ogden Property for a similar purpose. Clearly, then, whatever the purpose of the First Loan was, it was distinct from the purposes of the subsequent loans.

Therefore, we conclude that the three subsequent Loans were the result of transactions which were completely unrelated to the First Loan. This is especially true when we observe that the Brother and the Sister were parties to the First Loan but were not parties to any of the others. Other indicia are that the subsequent transactions (1) were consummated via, and memorialized pursuant to, completely separate promissory notes and mortgage agreements; and (2) were subject to separate repayment schedules and financing rates.

 Thirdly, there is no evidence on the record that the Debtor had any actual knowledge of the presence of the dragnet clauses in the Loan documents or that the Debtor had any intention that the Baring or Wanamaker Properties were to be used to secure other debts. As noted by the court in *In re Grizaffi*, 23 B.R. 137, 139 (Bankr.D.Colo.1982),

> [w]hen considering future advance "dragnet" clauses like the one contained in the . . . promissory note, the intention of the parties must be determined. The Court should look to what the parties reasonably contemplated as the obligation at the time of the agreement. The . . . note used in Mr. Grifazzi's transaction is very similar to one used in *In re Bason*, 20 B.R. 49, 33 U.C.C. Rep. Serv. 1121 (Bankr.E.D.Tenn.1982). The Court there said:
>
> > "In connection with the automobile Loan the bank officer used a 'form' agreement. While he knew the contents of the agreement, the bank officer gave no thought to the future advance clause. He did not discuss the clause with the Debtor. The Debtor had no actual knowledge of the clause and had no intention for the automobile to secure other loans. p. 1122."
>
> [In the instant case t]he . . . officer for the . . . [b]ank testified that he did not remember discussing this "dragnet" clause with Mr. Grizaffi.

 Dragnet clauses on printed forms should not generally be deemed valid to secure later advances unless it is clear that the parties contemplated this at the time the agreement was made. *See* 68A AM. JUR.2d, Secured Transactions, § 250, at 238–39 (1993 & Supp.1999). The evidence of record points to the conclusion that the dragnet clauses provided in the four transactions under scrutiny were intended to be separately secured.

Finally, there is no evidence on the record which supports a finding of the fourth factor, *i.e.*, reliance by CDB upon the dragnet clause in the First Loan in its making of the further Loans to the Debtor. The Second, Third, and Fourth Loan Mortgages were essentially purchase-money mortgages, in which the respective

properties purchased were put up as security. In most real estate purchase transactions, such security is all that is provided and is deemed sufficient. Unless we can assume that CDB swindled the Debtor in these purchase transactions, that security would appear to be sufficient here.

We thus find that the dragnet clause appearing in the First Loan documents, as well as the similar clauses in the documents executed in connection with the Second, Third, and Fourth Loans, satisfy none of the elements of the test for determining the enforceability of dragnet clauses formulated in *Shapiro* and reiterated in, *e.g., Fassinger*, which articulate the "relatedness rule." Therefore, we are constrained to conclude that the said dragnet clauses are not enforceable, particularly as to rendering the Second, Third, and Fourth Loan balances secured by the Baring and Wanamaker Properties.

In light of this conclusion, we find that only that portion of the Claim arising from the First Loan is secured by the Baring and Wanamaker Properties. That is to say, from the $153,852.49 amount of CDB's allowed total Claim, only that judgment attributable to the First Loan in the amount of $46,609.74 constitutes a valued secured claim.

We arrive at the amount of the secured portion of the Claim by using the arithmetical formula applied on page 654 *supra*, as to the first judgment only. In this calculation, we also will apply the Debtor's post-petition payments of $3303 to the secured portion of CDB's claim, towards which they obviously were intended to be credited. The calculation of the secured portion of CDB's claim is therefore as follows:

DAILY RATE OF INTEREST × JUDGMENT DATE/PLAN CONFIRMATION DATE × JUDGMENT AMOUNT = TOTAL INTEREST YIELD

.000164383 × 423 DAYS × $46,862.21 = $3,257.10

\* \* \* \*

| | | |
|---|---|---|
| DOLLAR AMOUNT AWARDED ON FIRST TRANSACTION | | $46,862.21 |
| AMOUNT OF INTEREST RATE ALLOWED | + | $ 3,257.10 |
| DOLLAR AMOUNT SECURED IN INSTANT CLAIM | | $50,110.31 |
| DOLLAR AMOUNT ALREADY CONTRIBUTED INTO PLAN | - | ($ 3,303.00) |
| | | $46,816.31 |

Again recognizing that interest has been calculated on the entire balance without considering the post-petition payments, we will round off this figure to $46,800.00.

The valid secured claim of CDB is therefore found to be $46,800.00. The $103,700 balance of the Claim is classified as unsecured.

3. *As a Result of Our Determinations Regarding CDB's Claim, the Motion Will Be Denied and the Debtor Will Be Ordered to Prepare an Amended Plan Consistent Therewith.*

From the foregoing determinations of the valid amounts of the secured and unsecured portions of CDB's Claim, the Debtor is left with a valid secured claim of $46,800 which he must liquidate in his Chapter 13 plan. *See* 11 U.S.C. § 1325(a)(5)(B). The plan must also provide for deferral interest, at the "market rate," on this amount to satisfy the requirements of that Code section. Without determining what that rate should be, we note that we recently held in *In re Reed*, 247 B.R. 618, 624 (Bankr.E.D.Pa.2000), that the appropriate deferral interest of a similar amount would add an obligation to pay about $11,000 more. Also, it may be necessary to liquidate secured claims of the City for delinquent real estate taxes and water and sewer obligations, although it is often preferable for debtors to make arrangements to pay such claims "outside" of the plan and thereby save the Trustee's commission on these amounts.

However, Trustee's commissions on total payments of at least $58,000 will apparently require payment of $5800 more. It therefore appears that a plan paying at least $63,800 must be conceived by the Debtor to satisfy the feasibility requirement. The Debtor's present plan, paying a total sum of $48,000, obviously falls somewhat short of this. However, it appears that such a plan may be within the Debtor's reach.

For that reason, we will deny the Motion, without prejudice to revival if a plan is not promptly confirmed. We will also require the Debtor to file and serve an amended plan consistent herewith by June 23, 2000, having already relisted the hearings on confirmation and the Trustee's motion to dismiss on July 20, 2000.

### D. *CONCLUSION*

An appropriate order follows.